OPINION OF THE COURT
 

 Ciparick, J.
 

 Once again we are called upon to consider the scope of an accountant’s liability to a non-privy third party for misrepresentations. This time the issues are presented, through certified questions, in the context of the heavily regulated relationships among actors in the financial markets.
 

 Plaintiff Securities Investor Protection Corporation (SIPC) claims that defendant EDO Seidman (EDO), an accounting firm, fraudulently or negligently misinformed federal securities regulators about the precarious financial condition of EDO’s client A.R. Baron & Co., a New York-based stock brokerage
 
 *706
 
 firm. During its four years of operation (1992-1996), Baron filed annual financial statements with the National Association of Securities Dealers (NASD) as required by the rules of the Securities and Exchange Commission (17 CFR 240.17a-5 [d]). SEC rules also required that Baron’s financial statements be audited by an independent certified public accountant
 
 (id.).
 
 Baron hired BDO for that purpose.
 

 In 1996, Baron filed for bankruptcy. A subsequent investigation revealed that Baron’s management team, led by its Chief Executive Officer, Andrew Bressman, had engaged in conduct that violated securities laws and brought Baron to the brink of financial collapse. As SIPC alleges in its complaint, Baron’s management team fraudulently sold securities to customers, manipulated initial public offerings and manipulated trading in the after-market in order to create artificially inflated stock values. SIPC further alleges that these and other criminal acts were done for the personal gain of members of Baron’s management team, their friends and other insiders. A New York Grand Jury indicted 13 of Baron’s employees and all were convicted of crimes for activities while at the brokerage firm. Baron itself pleaded guilty to one count of enterprise corruption.
 

 SIPC alleges that while Baron’s managers were misappropriating company assets, they were simultaneously concealing the company’s growing debt by hiding its inventory of “house stocks” in customers’ accounts or at other brokerage houses. It is undisputed that EDO’s audit reports never noted such practices. As required by SEC rule, BDO issued an annual opinion assessing Baron’s internal bookkeeping practices and procedures for safeguarding securities (17 CFR 240.17a-5 [g]). In its official statements for all four years of Baron’s operation, BDO noted no material weaknesses with Baron’s internal controls or procedures for safeguarding securities.
 

 SIPC’s complaint further charges that, by failing to perform a proper audit, BDO was able to certify that Baron maintained a healthy ratio of debt to net capital. The SEC prescribes the ratio of debt that a broker may carry relative to its readily liquid capital
 
 (see,
 
 17 CFR 240.15c3-l). This “net capital rule” requires that a broker’s debt not exceed 15 times the amount of liquid capital. In fiscal years 1992, 1993 and 1994 defendant’s audits certified that Baron’s debt was approximately equal to its net capital, a figure far below SEC limits. It was not until its audit for fiscal year 1995, issued weeks before Baron declared bankruptcy, that BDO reported for the first time that Baron’s debt exceeded 15 times its net capital.
 

 
 *707
 
 EDO also included an “Independent Auditors’ Report” with each of its annual filings
 
 (see,
 
 17 CFR 240.17a-5 [g]). These reports supplemented the other data required by the rules. In fiscal year 1993, the Auditor’s Report noted that the company had incurred significant losses from operations which raised substantial doubts as to the ability of the company to continue as a going concern. The 1993 Auditor’s Report also noted that the SEC had begun an investigation of Baron and that Baron was in arbitration with several of its customers over losses incurred.
 

 The 1994 Auditor’s Report once again mentioned the SEC’s ongoing investigation of possible securities laws violations, in particular that the SEC suspected that Baron had illegally manipulated the market, had executed unauthorized stock trades and failed to execute customers’ sell orders, and that the SEC was considering various sanctions against the company. The 1994 Report revealed that the NASD was also conducting an investigation of Baron for improprieties relating to another security and likewise considering sanctions against the company. The 1994 Auditor’s Report again mentioned the customers’ arbitration proceedings against Baron, with total claims exceeding $10 million. In its last Auditor’s Report for fiscal year 1995, defendant repeated reference to the SEC investigation, added that customer arbitrations and lawsuits had grown to claims exceeding $80 million and that, as a result of the bankruptcy of Baron’s clearing broker, Baron was in danger of being unable to collect a receivable of over $3.3 million.
 

 The Audit Reports prepared by BDO were all sent to the NASD as the regulatory organization designated by the SEC to oversee Baron’s compliance with securities laws
 
 (see,
 
 15 USC § 78o-3). None of EDO’s Audit Reports were sent to SIPC.
 

 SIPC was created by the Securities Investor Protection Act of 1970 (SIPA) (15 USC §§
 
 78aaa-78III)
 
 to protect customers of broker-dealers and maintain confidence in the United States securities markets. These goals are accomplished in two principal ways. First, when a broker is in or approaching financial difficulty, SIPC has the authority to petition the courts for protection of the broker’s customers in a “protective proceeding.” Such protection can include the court-ordered appointment of a trustee to liquidate the firm and satisfy customer claims from the proceeds of the liquidation (15 USC § 78fff). Second, SIPC is endowed with funds raised by assessments on its members, who are all the brokers registered under
 
 *708
 
 Securities Exchange Act § 15 (b) (15 USC § 78o [b]). From these funds, SIPC can advance monies to the trustee to settle claims (15 USC § 78fff-3). As a result of EDO’s alleged misstatements, SIPC claims it was required to spend over $2.5 million settling the claims of Baron’s customers and $5.5 million in administrative fees associated with Baron’s liquidation.
 

 While SIPC is not an agency of the government, the SEC exercises extensive control over its business affairs
 
 (see,
 
 15 USC § 78ccc). SIPC does not have independent investigatory powers to certify the financial health of its members. It does not receive financial statements from its members, much less audit them. No statute or rule requires brokers to submit their audited financial statements to SIPC as they are required to do for the SEC or the designated self-regulatory organization, here the NASD.
 

 In order to commence a “protective” proceeding, SIPC must first be aware that a broker is in financial difficulty. Notice to SIPC is contemplated in section 78eee of SIPA. Under that section, the SEC or one of the self-regulating organizations, such as the NASD, is required to notify SIPC when it becomes “aware of facts which lead it to believe that any broker or dealer subject to its regulation is in or is approaching financial difficulty” (15 USC § 78eee [a] [1]). In the present case the pleadings do not state how SIPC ultimately became aware of Baron’s financial difficulties in 1996; however, a protective proceeding followed and James Giddens was appointed trustee for the liquidation of Baron.
 

 Both Giddens and SIPC commenced the present action in the United States District Court for the Southern District of New York. Giddens asserted claims against BDO for negligence, fraud and breach of contract. SIPC asserted claims for negligence and fraud, both as subrogee to the claims of Baron’s customers and on its own behalf for the administrative costs associated with the liquidation. On EDO’s motion, the District Court dismissed the complaint as to SIPC, concluding that SIPC did not have standing to sue on its own behalf and that the allegations on behalf of Baron’s customers failed to state claims for fraudulent or negligent misrepresentation under New York law. The trustee’s claims were also dismissed. The United States Court of Appeals for the Second Circuit concluded that SIPC lacked standing to sue on behalf of Baron’s customers but that it could sue on its own behalf. The court certified to us two questions of New York law in order to determine whether SIPC’s allegations stated causes of action for negligent and fraudulent misrepresentation:
 

 
 *709
 
 “1. May a plaintiff recover against an accountant for fraudulent misrepresentations made to a third party where the third party did not communicate those misrepresentations to the plaintiff, but where defendant knew that the third party was required to communicate any negative information to the plaintiff and the plaintiff relied to his detriment on the absence of any such communication?
 

 “2.
 
 May a plaintiff recover against an accountant for negligent misrepresentation where the plaintiff had only minimal direct contact with the accountant, but where the transmittal to the plaintiff of any negative information the accountant reported was the ‘end and aim’ of the accountant’s performance?”
 
 (Securities Investor Protection Corp. v BDO Seidman, 222
 
 F3d 63, 81.)
 

 The gravamen of SIPC’s state law claims is that, had BDO accurately informed the regulatory authorities in its audit reports about Baron’s precarious financial condition, SIPC could have intervened earlier, thereby avoiding expenditures associated with the liquidation. SIPC concedes that at no relevant time prior to the liquidation did it actually receive EDO’s audit reports. Rather, SIPC claims it relied on a reporting system created by federal securities law for delivery of negative information about Baron’s financial condition. The question thus becomes whether, under the undisputed facts and circumstances presented, SIPC can state a cause of action for either fraudulent or negligent misrepresentation. That question we answer in the negative.
 

 Fraudulent Misrepresentation
 

 While conceding that none of EDO’s statements concerning Baron’s financial health ever reached it, SIPC claims that, under the regulatory scheme, it understood silence to mean that BDO had given Baron a clean bill of health. We conclude, however, that “no news is good news” is an insufficient basis for SIPC’s fraud claim here.
 

 The principle we reaffirm today is well rooted in New York law. Plaintiff cannot sustain a cause of action for fraud if defendant’s misrepresentation did not form the basis of reliance
 
 (Brackett v Griswold,
 
 112 NY 454;
 
 Warren v Forest Lawn Cemetery & Mausoleum, 222
 
 AD2d 1059). As conceded in the complaint, SIPC relied to its detriment on the implication of the NASD’s silence, not on representations from BDO.
 

 
 *710
 
 Beyond the general and unremarkable principle that liability for fraud can be imposed through communication by a third party, the differences between
 
 Tindle v Birkett
 
 (171 NY 520) and the instant case are clear. In
 
 Tindle,
 
 plaintiff received defendant’s misrepresentations in the form of a positive credit report upon which it relied. In this case, although the complaint alleges BDO made a variety of misrepresentations, it also alleges that SIPC did not specifically know of any of them. SIPC cannot claim reliance on alleged misrepresentations of which it was unaware even by implication.
 

 This is not to say that a misrepresentation cannot be communicated through silence. There are situations where a material omission can induce detrimental reliance as effectively as a false statement
 
 (see, Gaidon v Guardian Life Ins. Co.,
 
 94 NY2d 330, 348;
 
 New York Univ. v Continental Ins. Co.,
 
 87 NY2d 308, 318). The omission on which SIPC claims reliance, however, did not come from BDO, it came from the NASD. As a result, the role of the NASD cannot be ignored. The inescapable conclusion from the complaint’s reference to the reporting rules and the regulatory “early warning system” is that the NASD had a significant role in choosing what information it wanted to receive and, in addition, what it deemed worthy of communicating. In such a situation SIPC’s reliance on silence from the NASD cannot be equated with its reliance on any affirmative misrepresentation or concealment of material fact by BDO.
 

 This is so because the reporting system on which SIPC relied put too much discretion in the hands of the NASD for SIPC to be able to claim any significant direct reliance on BDO. SEC filing requirements, including those regarding independently audited statements, collectively enable the relevant regulatory authorities to perform their oversight functions
 
 (see generally, Touche Ross & Co. v Redington,
 
 442 US 560, 569). The “reports and records provide the regulatory authorities with the necessary information to oversee, compliance with and enforce the various statutes and regulations with which they are concerned”
 
 (id.).
 
 The SEC and the NASD then use such information and their regulatory expertise to evaluate a brokerage firm’s financial status, looking at the firm’s compliance with the net capital rule and other indicators of financial health
 
 (see, id.;
 
 17 CFR 240.17a-5). The instant case illustrates the evaluative regulatory role played by the SEC and the NASD with relation to communications to SIPC. Here, the considerable negative information of Baron’s financial distress in the
 
 *711
 
 EDO Audit Reports was not communicated to SIPC. The regulators’ evaluative role makes SIPC’s claim of reliance on silence from the NASD as an indicator of “good news” untenable.
 

 SIPC’s complaint assumes that silence from the regulators can mean only one thing. In this case, however, the absence of communication from the NASD to SIPC could have meant any number of things, among them that the regulators were not carefully reading defendant’s audits. The vagaries inherent in SIPC’s theory of liability convince us that no information at all is simply too little information on which to base a claim for fraudulent misrepresentation here. Where EDO’s reports were filtered through the NASD’s own process of evaluation, SIPC cannot claim justifiable reliance on the filtered statements, or the absence thereof, as representing either the sum or substance of EDO’s representations. The regulatory framework involved in this case thus creates an insurmountable disconnect between EDO’s representations and SIPC’s purported reliance on those representations.
 

 Negligent Misrepresentation
 

 The elements of a cause of action for negligent misrepresentation are likewise not present here. EDO did not engage in conduct linking it to SIPC in such a way as to create a relationship between the two that sufficiently approached privity
 
 (Credit Alliance Corp. v Arthur Andersen & Co., 65
 
 NY2d 536).
 

 A number of recent cases have called upon this Court to apply the professional liability rule of
 
 Credit Alliance (see, e.g., Parrott v Coopers & Lybrand,
 
 95 NY2d 479;
 
 State of Cal. Pub. Employees’ Retirement Sys. v Shearman & Sterling,
 
 95 NY2d 427;
 
 Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood,
 
 80 NY2d 377). As we have made clear, “end and aim” is not the only focus of the- negligent misrepresentation analysis. While we explicitly adhered to the principles set forth in
 
 Ultramares Corp. v Touche
 
 (255 NY 170) for imposing negligence liability on accountants, in applying those principles we identified three critical criteria for imposing liability. In deciding whether liability can be imposed by a non-privy third party, we ask whether the accountant was aware that the reports were to be used for a particular purpose, whether in furtherance of such purpose a known party was intended to rely and, finally, whether there was some linking conduct which evinced the accountant’s understanding of that party’s reliance
 
 (Credit Alliance Corp. v Arthur Andersen & Co., supra,
 
 65 NY2d, at 551).
 

 
 *712
 
 Applying those criteria here, there was no “linking conduct” that put SIPC and EDO in a relationship approaching privity. EDO’s audits were not prepared for the specific benefit of SIPC, were not sent to SIPC, were not read by SIPC and, as a result, did not place SIPC in a relationship significantly different from anyone else in the regulatory community or the investing public at large. Hence, the third prong of the
 
 Credit Alliance
 
 test is not met. Absent allegations tending to show linking conduct, SIPC’s complaint cannot state a cause of action for negligent misrepresentation.
 

 Accordingly, both certified questions, in the context of the facts and circumstances presented, should be answered in the negative.
 

 Chief Judge Kaye and Judges Smith, Levine, Wesley, Rosenblatt and Graffeo concur.
 

 Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions, in the context of the facts and circumstances presented, answered in the negative.