[729 NYS2d 671]

# LaSalle National Bank et al., Respondents, v Ernst & Young L. L. P., Appellant.

First Department, August 9, 2001

**APPEARANCES OF COUNSEL**

*David Smith* of counsel (*M. Christine Carty, Lisa M. Cobb, Christina Rainville* and *Theresa E. Loscalzo* on the brief; *Schnader Harrison Segal & Lewis, L. L. P.*, attorneys), for respondents.

*Bruce M. Cormier* of counsel (*Patricia A. Connell, Irvin B. Nathan, Leonard H. Becker, Kent A. Yalowitz* and *Alan S. Rabinowitz* on the brief; *Ernst & Young, L. L. P.*, and *Arnold & Porter*, attorneys), for appellant.

**OPINION OF THE COURT**

TOM, J.

In this case we return to the recently active legal area of the negligence liability of accountants to third parties with whom they are not in privity. Here, we examine the element of "linkage" required by the third prong of the *Credit Alliance* test (*Credit Alliance Corp. v Arthur Andersen & Co.*, 65 NY2d 536), and more recently articulated in *Parrott v Coopers & Lybrand* (95 NY2d 479) and *Securities Investor Protection Corp. v BDO Seidman* (95 NY2d 702). We also examine whether a cause of action for fraud against the defendant accounting firm may survive CPLR 3211 dismissal in the present case.

The underlying action arose from a loan made by plaintiff lender LaSalle National Bank (LaSalle) to non-party Kent International Associates, Ltd. (Kent), which purportedly was induced, at least in part, by financial statements prepared by defendant Ernst & Young.

In 1994, Kent, a relatively new wholesale distributor of electronic products and appliances, sought financing from LaSalle, to be secured by capital assets, to use for operating expenses. Kent, as a distributor, profited from the spread between its purchase price of the items and the price at which it sold them. In order to maintain its operations, it needed large sums of operating capital. Kent initially had indebted itself to other lenders in an amount of approximately $14 million, which it now sought to consolidate in a single loan with LaSalle. Kent and LaSalle entered a Loan and Security Agreement in October 1994 for $20 million secured by assets, including its accounts receivable and inventory. The credit was structured so that Kent could borrow up to a percentage of the specified assets. As a condition of the agreement, Kent was prospectively required to provide LaSalle with annual financial statements certified by an independent certified accountant to be selected by Kent. The 1994 $20 million loan was increased to $35 million in June 1995. Kent discharged its prior accountants and retained defendant Ernst & Young in December 1995. The loan was increased to $50 million in February 1996.

Ernst & Young issued the 1995 audit report on March 29, 1996. The report was addressed to "the Shareholders of Kent International Associates, Ltd." After explaining the nature and purpose of the audit, Ernst & Young stated an opinion that the financial statements provided by management "present fairly, in all material respects, [Kent's financial position] and the results of its operations and its cash flows for the year." In the

body of the report it was noted that the loan had been increased to $50 million in February and the term extended to October 1999.

Subsequent to the 1995 audit, Kent sought yet more financing. Plaintiffs allege that LaSalle employees and unidentified employees of "another of the Lenders" tried by telephone, unsuccessfully, to get assurances from Ernst & Young that Kent's internal controls were sufficient to manage its apparently rapid growth during the first half of 1996. The amended complaint alleges that eventually an unidentified Ernst & Young partner returned a call to an unidentified La-Salle employee and an unidentified employee of another lender, also unidentified. The date of the telephone conversation is not even generally identified, except that it happened "eventually." Plaintiffs allege that the unidentified employees told the unidentified accountant that they were relying on the purported call along with the 1995 audit report—to which they were apparently not entitled—in making a decision to increase and syndicate the loan. Plaintiffs also allege that the accountant assured the employees that Kent could handle its rapid growth. In any event, in reliance on the putative assurances provided by Ernst & Young, the loan was syndicated to other financial institutions and increased to $65 million in June 1996. As a condition of the June 4, 1996 Amended and Restated Loan and Security Agreement between Kent and the various lenders, Kent was again required to provide annual financial statements certified by an independent public accountant. Plaintiffs allege in the amended complaint that it was also a condition that the accountant acknowledge "that a primary purpose of the financial statements was to induce the Lenders to lend money to Kent and that the Lenders would rely on the audited financial statements in connection with the Loans." The amended complaint does not allege that such acknowledgment was ever provided, and presumably it was not. Plaintiffs further allege that in reliance on Ernst & Young's assurances and its audit, the loan was further increased to $75 million in July 1996, and yet again to $115 million in August 1996. What, if any, supplemental assurances were provided in connection with each substantial, and speedy, increase in the financing, is not alleged.

The next audit report was issued in March 1997 in connection with the 1996 audit. In a boilerplate fashion, the report, addressed again to Kent shareholders, offered the opinion that the financial statements were fairly presented. The same al-

legations are made in the pleadings regarding Ernst & Young's awareness of plaintiffs' reliance on this report.

In or around August 1997, some accounting ploys that Kent had apparently used in connection with its accounts payable were uncovered by the lenders. On September 9, 1997, Kent's attorney informed LaSalle that Kent had provided inaccurate and false information by various means, including its audited financial statements. Ernst & Young resigned on September 25, 1997, withdrew its audit report of Kent's 1996 financial statements, and directed Kent to notify any party using those financial statements of the withdrawal of the audit report and that the report could not be relied upon. Kent subsequently filed for bankruptcy.

LaSalle and other lenders commenced the underlying action against Ernst & Young for negligence, negligent misrepresentation, breach of contract and fraud, in connection with the accounting services provided to Kent, alleging that they were intended to be direct, and not merely incidental, beneficiaries of those services. Defendant Ernst & Young moved to dismiss for failure to state a cause of action and for plaintiffs' failure to plead fraud with particularity. The IAS court denied the motion. We reverse and dismiss the complaint.

■ In order to impose negligence liability on an accountant for injury to a non-contracting third party resulting from the accountant's advice or services, the third party must establish each prong of the *Credit Alliance* test, that is: (1) the accountant's awareness that the financial reports were to be used for a particular purpose or purposes, (2) reliance on the reports by a known party or parties, and (3) some linking conduct on the part of the accountant which evinced the accountant's understanding regarding the third party's reliance (*Parrott v Coopers & Lybrand, supra*, at 484; *Securities Investor Protection Corp. v BDO Seidman, supra*, at 711). Notwithstanding some degree of overlap among these requirements, they are distinct. They must be distinctly pleaded and, if the action survives a CPLR 3211 dismissal motion, proved. As we have illustrated the test, "[a]s with a three-legged table, remove one prop, and the entire structure must fall" (*Parrott v Coopers & Lybrand*, 263 AD2d 316, 321, *affd* 95 NY2d 479, *supra*). Since we review a CPLR 3211 motion to dismiss on the pleadings, rather than, as in *Parrott*, in a summary judgment context, the standard guiding us is whether the allegations in the complaint, construed liberally, satisfy each of these three requirements. Although we focus here on the pleadings, the

pleadings still must establish a basis of liability arising from "either actual privity of contract between the parties or a relationship so close as to approach that of privity" requiring "a clearly defined set of circumstances which bespeak a close relationship premised on knowing reliance" (*Parrott, supra,* at 483, 484 [citations omitted]). In analyzing the degree to which assurances by an accountant to a third party may properly be the basis for reliance, we have declined "to extend accountant malpractice to a third party's reliance on alleged verbal assurances" (*Lampert v Mahoney, Cohen & Co.,* 218 AD2d 580, 582).

It should be noted that Ernst & Young had been retained only a few weeks before the time the loan was increased to $50 million. Hence, any contention that LaSalle had relied up to that time on any responsibility undertaken or statement issued by Ernst & Young in making its own business decisions to sharply increase financing, would be manifestly insupportable. By this point, LaSalle was syndicating Kent's loan with other lenders. Similarly, no other lender can demonstrate any reliance on Ernst & Young's services by the time the loan reached $50 million.

In the amended complaint, LaSalle and the several other lenders allege several items that, they contend, should have put Ernst & Young on notice that LaSalle and other lenders were relying on the auditing reports in extending financing to Kent. Plaintiffs allege that "Lenders and Kent caused to be sent to Ernst & Young a letter that recited the Lenders' reliance upon Kent's certified or audited financial statements in connection with the Loan." Who sent the letter, when it was sent, exactly what it recited, and whether its receipt was acknowledged, let alone whether it was even responded to, are not alleged. Needless to say, a copy of the putative letter that, one would think, was so critically important for purposes of the loan and is critically important now for purposes of suing the accountant, is not included in the record. The amended complaint also refers to a 1994 letter from LaSalle to Kent's prior accountants indicating that their services would be relied on by "the Bank in connection with the exercise of its rights under the Loan and Security Agreement entered in October 1994." Initially, it is less than clear what kind of obligations that letter would even impose on the prior accountants, but it is manifestly clear that it has no bearing on Ernst & Young's provision of standard annual accounting services to Kent. Plaintiffs contend that it must have been in Kent's files, which must have been reviewed by Ernst & Young during the audit,

and that, ergo, Ernst & Young was placed on notice regarding third-party reliance. However, whether or not the letter was in the file, and whether or not it was reviewed by Ernst & Young during the 1995 audit, is speculative. It also is logically unrelated to LaSalle's February 1996 decision to increase the loan to $50 million when the 1995 audit was not then completed, and even plaintiffs' own complaint alleges that LaSalle did not receive a copy of the report until March 29, 1996.

■ The weakest, and ultimately fatal, leg of the *Credit Alliance* table here is the issue of linkage. Plaintiffs must plead some affirmative conduct by Ernst & Young linking it to plaintiffs' alleged reliance, other than the performance of the audit itself. The only such affirmative conduct alleged is the purported return phone call by the unidentified Ernst & Young partner to unidentified plaintiffs' employees. Although plaintiffs also allege that they sent a letter to Ernst & Young advising it of plaintiffs' intention of relying on the audit report in extending additional financing, it is not alleged that Ernst & Young ever acknowledged the letter or otherwise acted to confirm the letter's receipt. At most, then, the alleged letter remains unilateral conduct by the lenders, and not affirmative conduct by Ernst & Young. Plaintiffs allege throughout their complaint that Ernst & Young had been advised of plaintiffs' reliance on the audit report, but such allegations, which are never supported by any degree of detail, also do not equate with Ernst & Young's affirmative conduct evincing its acknowledgment that the plaintiffs relied on the audit reports. The "special purpose" requirement of the first prong, the "reliance" requirement of the second prong, and the "linkage" requirement of the third prong, as noted, are distinct elements. Allegations possibly establishing the first two requirements, which may be satisfied even by the accountant's passivity, do not suffice to establish linkage, requiring the accountant's affirmative conduct.

Our analysis is governed by the analogous situation in *Security Pac. Bus. Credit v Peat Marwick Main & Co.* (79 NY2d 695), in which the lender alleged that it had informed a partner in the accounting firm performing an audit on the borrower that the decision to grant the loan would be conditioned on the audit's findings as to the borrower's income. This single phone call initiated by the lender did not satisfy the third *Credit Alliance* prong. The present pleadings do not even rise to that level. Here, plaintiffs allege that in this single telephone call Ernst & Young provided assurances that Kent's internal control and accounting systems were able to handle the rapid

growth it had experienced in the early part of 1996. Even leaving aside the extreme generality of the alleged assurance, one would certainly expect as a matter of basic prudence that if a sophisticated lender is considering increasing a loan to $65 million, and other sophisticated lenders were considering participating in the syndication of a $65 million loan, someone would have put something in writing, or at least would have better memorialized the details of this allegedly critically important conversation, including the names of the participants. But the pleadings are silent on this important link between the accountant and the third party that is postulated as a substitute for privity. Hence, the privity or near-privity relationship is not adequately pleaded and the negligence claims must be dismissed. As such, we need not determine whether the first two *Credit Alliance* prongs have been satisfied for pleading purposes.

■ Nor does the complaint support the breach of contract claim. In order to state a cause of action, plaintiffs must plead facts sufficient, if proved, to establish that plaintiffs were intended beneficiaries of the contract. For cases in which the claimant is not a party to the contract, but claims third-party rights therefrom, New York has adopted the standard set forth in the Restatement (Second) of Contracts. In order to claim third-party benefits, the putative third-party beneficiary will be deemed an intended beneficiary if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties *and* either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary [not relevant here]; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. * * * An incidental beneficiary * * * is not an intended beneficiary" (*id.* § 302 [emphasis added]; *Fourth Ocean Putnam Corp. v Interstate Wrecking Co.,* 66 NY2d 38, 45). A non-party may sue for breach of contract only if it is an intended, and not a mere incidental, beneficiary (*Alicea v City of New York,* 145 AD2d 315, 317), and even then, even if not mentioned as a party to the contract, the parties' intent to benefit the third party must be apparent from the face of the contract (*Strauss v Belle Realty Co.,* 98 AD2d 424, 426-427, *affd* 65 NY2d 399; *see also, Fireman's Fund Ins. Co. v Glass,* 1997 US Dist. LEXIS 7518, 1997 WL 289858 [SD NY, May 30, 1997] [applying New York law]). Absent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe

such an intent (*Fourth Ocean Putnam, supra; Fireman's Fund Ins., supra*).

The December 4, 1995 retention agreement was between Kent and Ernst & Young; neither LaSalle nor any other lender was mentioned. The letter agreement was drafted by Ernst & Young, and set forth the accounting firm's engagement to audit and report on Kent's 1995 and 1996 financial statements. Nowhere does this retention letter evince any intention by either signatory party that the audit was to be used for other purposes or relied on by other parties, or that information generated and reported on during the audit would be transmitted to other parties. The engagement letter formalizing the contractual relationship makes no reference to any third party, nor even to the loan. The pleadings do not set forth any basis upon which we could construe the existence of third-party rights and that plaintiffs were intended to be the third-party beneficiaries. We would also dismiss the breach of contract claim, which basically alleges a breach of general professional standards, as being redundant to the negligence claims (*IMO Indus. v Anderson Kill & Olick*, 267 AD2d 10, 12).

■ Turning to the fraud claim, in order to plead a prima facie case, a plaintiff must allege misrepresentation of material fact, falsity, scienter, deception and injury (*Mance v Mance*, 128 AD2d 448, *lv dismissed and denied* 70 NY2d 668; CPLR 3016 [b]), and each element must be pleaded with particularity. A complaint alleging fraud by an accountant "is expected to identify the particular manner in which an item included in the financial statement relied upon has been intentionally or recklessly misrepresented" (*Lampert v Mahoney, Cohen & Co.*, 218 AD2d 580, 582, citing *Credit Alliance, supra*), a standard not satisfied by mere negligence. Notably, most of the allegations set forth in the complaint under the fourth cause of action sounding in fraud actually allege conduct amounting to negligence rather than the intent to mislead the complaining party, to its detriment, that is the hallmark of a fraud claim. Negligence in Ernst & Young's purported departure from professional standards, no matter how well particularized, does not make out fraud and such allegations are only redundant to those in support of the dismissed negligence claim. As this Court has previously stated, negligence claims cannot be deemed fraud solely because of the nomenclature used and conclusory allegations of fraud (*Dworman v Lee*, 83 AD2d 507, *affd* 56 NY2d 816). Nor, as we more recently have stated, would the "mere conclusory assertion of recklessness

and intent, appended to the identical set of facts as are alleged in the negligence claim * * * meet the special pleading standards required under CPLR 3016 (b)" (*Marine Midland Bank v Grant Thornton*, 260 AD2d 318, 319, citing *Credit Alliance, supra*, at 554). Elsewhere under the fraud cause of action, plaintiffs allege that Ernst & Young supplied false information with the awareness that plaintiffs would rely on it, that Ernst & Young "manifested its understanding that plaintiffs intended to rely on the Kent Financials and Reports," that the loan agreements would not have been entered into but for the opinions and conclusions in the Financials and that the lenders thereby justifiably relied to their detriment on Ernst & Young's representations. However, as we stated elsewhere, these allegations do not "sufficiently allege the element of scienter required in a fraud cause of action asserted against a preparer of a financial statement," especially when the accountant's knowingly false statement, and knowing and direct participation in the fraud, are not shown (*John Hancock Mut. Life Ins. Co. v KPMG Peat Marwick*, 232 AD2d 283, *lv denied* 89 NY2d 809). Therefore, the fraud claim also cannot be sustained.

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered September 1, 2000, which denied defendant's motion to dismiss the amended complaint for failure to state a cause of action and failure to plead fraud with particularity, should be reversed, on the law, with costs, and the motion granted. The Clerk is directed to enter judgment in favor of defendant-appellant dismissing the amended complaint.

SULLIVAN, P. J., NARDELLI, WILLIAMS and FRIEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered September 1, 2000, reversed, on the law, with costs, and defendant's motion to dismiss the amended complaint for failure to state a cause of action and failure to plead fraud with particularity granted.