**ANGLO–IBERIA UNDERWRITING MANAGEMENT COMPANY and Industrial Re International, Inc., Plaintiffs,**

v.

**Daniel J. LODDERHOSE, Security Resources International, Inc., GC Insurance Brokers Limited, GC Intermediaries Limited, Peter J. Greengrass, Leslie J. Cooper, and A.J. Smith, Defendants.**

No. 97 Civ. 0084(VM).

United States District Court, S.D. New York.

Sept. 5, 2002.

John R. Keough, Waesche, Scheinbaum & O'Regan, New York City, for Plaintiffs.

Michael Gordon Biggers, Bryan Cave, New York City, Ronald R. Sussman, Kronish, Lieb, Weiner & Hellman, LLP, New York City, Jeffrey I. Lang, New York City, Charles Hyman, Nicoletti Kissel & Pesce LLP, New York City, Kirk R. McCormick, McCormick & Murphy, P.C., Colorado Springs, CO, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs Anglo–Iberia Underwriting Management Company and Industrial Re International, Inc. (collectively "Plaintiffs") brought this action invoking this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, and now move for summary judgment as to their claims of common law fraud, negligent misrepresentation, conversion, and breach of contract against defendants Peter I. Greengrass, GC Insurance Brokers Limited, Leslie J. Cooper, and A.J. Smith (collectively "Defendants"). For the reasons stated below, Plaintiffs' motion is granted in part and denied in part.

## I. BACKGROUND

The present dispute arises from a Quota Share and Excess of Loss Facultative and Treaty Reinsurances Slip Agreement (the

"Agreement")[1] entered into by P.T. Astek (Persero), also known as P.T. Jamsostek (Persero) ("Astek") and plaintiffs, Anglo-Iberia Underwriting Management Company ("AI") and Industrial Re International, Inc. ("IR"). Under the Agreement, Astek, an enterprise owned by the government of Indonesia, purportedly agreed to reinsure a portfolio of risk of ceding companies declared by AI for a period of two years commencing on January 1, 1995.[2] AI is a reinsurance underwriter, IR is a reinsurance intermediary, and Rene A. Gutierrez ("Gutierrez") is their president. Daniel J. Lodderhose ("Lodderhose") and Security Resources International, Inc. ("SRI"), his firm, were hired as Astek's global reinsurance managers by Prio Adhi Sartono ("Sartono"), an Astek employee, and all correspondence with Astek was to be directed through them. GC Insurance Brokers Limited[3] ("GC"), a reinsurance broker, along with Peter I. Greengrass ("Greengrass"), an officer, director, and owner of GC, brokered the Agreement, and all communications by Plaintiffs to Lodderhose, SRI, or Astek had to go through GC and Greengrass pursuant thereto. (Deposition of Peter Greengrass ("Greengrass Dep."), at 205–206, 316–320.) Leslie J. Cooper ("Cooper") was also an officer, director, and owner of GC, and A.J. (Tony) Smith ("Smith"), was an employee. Cooper administered GC's bookkeeping, and Smith first introduced the Plaintiffs to Greengrass, though he did so prior his employment with GC.

The negotiations that produced these arrangements commenced in earnest[4] at a reinsurance conference in Monte Carlo in September of 1995, which Gutierrez attended on behalf of Plaintiffs to find a replacement reinsurer for a reinsurance arrangement between AI and IR and a firm known as Dai-ichai & Kobe that had fallen through. (Greengrass Dep., at 58–61.)

Prior to this conference, Greengrass and GC, as reinsurance intermediaries attempting to broker and procure business, had inquired about Astek's reinsurance business, namely, whether it engaged in international reinsurance, and about Sartono's authority to act for the company. According to Greengrass, he asked Pieter Vlasbloem ("Vlasbloem"), an Indonesian

---

1. The term "Agreement" as used here refers principally to the slip agreement for excess of loss insurance between Plaintiffs and, ostensibly, P.T. Astek (Persero), also known as P.T. Jamsostek (Persero). This written contract provides a skeletal documentation of coverage and obligations. Many collateral arrangements were also agreed upon during the course of negotiating and executing this written contract. Some of these collateral arrangements were oral, some written, some are undisputed, and others are disputed. References to the "Agreement" here include the written contract along with certain collateral arrangements that are undisputed, as well as presumed additional arrangements not clearly established by the evidence presently available.

2. The factual recitation described below derives primarily from Plaintiffs' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1(a) filed May 1, 2002 and Defendants' Counterstatement of Undisputed Facts Pursuant to Local Civil Rule 56.1(b) dated June 26, 2002 ("Pl.'s 56.1 Statement" and "Def.'s 56.1 Statement" respectively). Further specific citations to these documents are omitted except as necessary.

3. This entity was known as GC Intermediaries Limited through February 20, 1996, at which point it changed its name to GC Insurance Brokers Limited. (Pl.'s 56.1 Statement; Amended Answer and Counterclaim and Crossclaim dated July 8, 1997, at ¶¶ 8, 9.)

4. Smith had told Greengrass that AI was in prompt need of a replacement reinsurer and that it was interested in exploring this prospect with Astek before his employment with GC and prior to the Monte Carlo conference. (Greengrass Dep., at 58–59, 63.)

reinsurance broker, if it was "possible, probable, that [Astek] would be moving into the international reinsurance business," and Vlasbloem replied that it was "very likely." (*Id.*, at 54–55.)

Lodderhose, prior to the initial negotiations underlying the Agreement at the Monte Carlo conference, suggested to Greengrass that Sartono was a director of Astek. (*Id.*, at 65–66.) Vlasbloem, however, in addition to reporting on Astek's reinsurance business, also explored Sartono's credentials and sent Greengrass a fax dated February 2, 1995 indicating that Sartono was not a director of Astek but a manager of a subdivision of the company, which led Vlasbloem to question Sartono's authority to initiate reinsurance arrangements. (Declaration of John R. Keough, III dated April 29, 2002 ("Keough Decl."), at App. 1, Ex. GC 36.) Accordingly, Vlasbloem recommended to Greengrass that "it is worthwhile investigating." (*Id.*) Nonetheless, Greengrass conducted no further investigation into Astek's reinsurance practice or Sartono's authority within the company. (Greengrass Dep., at 56–57.) Instead, knowing that Plaintiffs were in quick need of a replacement reinsurer, Greengrass negotiated and brokered the Agreement, with much of the principal discussions and introductions occurring at a meeting during the Monte Carlo conference attended by Greengrass, Lodderhose, Sartono, and Gutierrez and arranged by Greengrass. (Greengrass Dep., at 58–67.)

Greengrass and GC did not pass along to Plaintiffs any of this information concerning Astek's business or Sartono's credentials with the company and, with no definitive inquiry into the matter, repeatedly represented to Plaintiffs that Astek's practice included international rein-

surance and that the Agreement through Sartono was valid. Greengrass himself communicated as much via facsimile to IR on November 13, 1995. (Keough Decl., at App. 1, Ex. GC 42.)

In October–November of 1995, Plaintiffs formally entered into the Agreement with Astek, (Declaration of Rene A. Gutierrez dated January 26, 1998 ("Gutierrez Decl."), at ¶ 8), and through August of 1996, AI and IR paid premiums and brokers' fees in the amount of $711,031.65 to GC, in accordance with the Agreement. GC retained approximately $75,000 in satisfaction of its broker fees [5] and forwarded the rest to SRI and Astek, again, in accordance with the Agreement. (Keough Decl., at App. 2, Ex. G.) AI and IR, as reinsurance underwriting manager and intermediary, respectively, endeavored to register Astek in Latin America, the Caribbean, and Mexico, promoted Astek to clients, and generally managed and administered Astek's reinsurance account. (Gutierrez Decl., at ¶ 13.)

By late August of 1996, the parties' relationships had deteriorated. Plaintiffs claim that in contravention of the Agreement, AI and IR, despite repeated requests, never received the necessary corporate, financial, and Indonesian governmental documents necessary to register Astek as an international reinsurer in certain designated countries. (*Id.*, at ¶ 18.) In August of 1996, after repeated unsuccessful attempts to acquire these documents, AI and IR stopped paying the premiums provided for in the Agreement, and Lodderhose notified Plaintiffs that Astek was voiding the Agreement. When Plaintiffs then circumvented GC, Greengrass, SRI, and

---

**5.** Greengrass did not recall during his deposition precisely what figure would constitute his fee but agreed that it was approximately 10 percent of the premium payments to Astek. (Greengrass Dep., at 169–171.)

Lodderhose and contacted Astek directly, they discovered that Sartono, SRI, and GC were not authorized to act on Astek's behalf and that Astek did not authorize any reinsurance in its name. (Gutierrez Decl., ¶ 21.) Plaintiffs' premium payments were never refunded. (Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment on Liability Against GC Defendants dated April 29, 2002 ("Pl.'s Brief"), at 8.)

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Rodriguez v. Hahn*, 209 F.Supp.2d 344, 346 (S.D.N.Y.2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The role of the Court is not to resolve issues of fact but, rather, "to determine as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Gibson v. American Broadcasting Cos.*, 892 F.2d 1128, 1132 (2nd Cir.1989). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," *id.*, 477 U.S. at 324, 106 S.Ct. 2548, and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2nd Cir.1998).

The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All ambiguities and inferences drawn from the underlying facts must be resolved in the light most favorable to the party opposing the motion. *See United States v. One Tintoretto Painting Entitled "The Holy Family With Saint Catherine and Honored Donor"*, 691 F.2d 603, 606 (2nd Cir.1982) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### B. *COMMON LAW FRAUD*

■ A New York common law fraud claim is defined as "a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." *Suez Equity Investors, L.P. and SEI Associates v. The Toronto-Dominion Bank, et al.*, 250 F.3d 87, 104–105 (2nd Cir.2001); *Banque Franco-Hellenique De Commerce International Et Maritime, S.A. v. Orestes Cristophides*, 106 F.3d 22, 25 (2nd Cir.1997).

■ The representations here at issue are those made by Greengrass and GC that Sartono was authorized to bind Astek

and that Astek's business included international reinsurance. Defendants admit that Greengrass and GC made these representations to Plaintiffs, that these representations were untrue, and that Plaintiffs were harmed insofar as they made what they supposed were premium payments pursuant to the Agreement for reinsurance services that would never materialize. (Def.'s 56.1 Statement, at ¶¶ 13, 15(c), 20–24, and 30.) What remains to be determined, therefore, is whether the representations by Greengrass and GC were either known to be untrue or recklessly made, whether they were "offered to deceive and to induce [Plaintiffs] to act upon [them,]" and whether Plaintiffs in fact were so induced.

According to the New York Court of Appeals,

> [a] representation certified as true to the knowledge of the [maker] when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the [representation]. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.

*State Street Trust Co. v. Ernst*, 278 N.Y. 104, 15 N.E.2d 416, 419 (1938); *Curiale v. Peat, Marwick, Mitchell & Co.*, 214 A.D.2d 16, 630 N.Y.S.2d 996, 1003 (1995); accord *Diamond Energy, Inc. v. Carbon/Graphite Group, Inc.*, No. 89–CV–910S, 1992 WL 225554, at *4 (W.D.N.Y. August 11, 1992); *Aeronca, Inc. v. Gorin*, 561 F.Supp. 370, 376 (S.D.N.Y.1983); *see also Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444 (1931) ("Fraud includes the pretense of knowledge when knowledge there is none.").

In the case at bar, Greengrass had been informed by Vlasbloem prior to meeting with Plaintiffs that Astek was "very likely" to expand its practice to include international reinsurance, (Greengrass Dep., at 54–55), but at no point did he conduct any further investigation to determine when, if ever, that expansion would occur. Instead, he told Plaintiffs that Astek in fact did authorize reinsurance in its name and assembled the principals for negotiations that would produce the Agreement. Further, Vlasbloem raised with Greengrass concerns about Sartono's credentials with Astek, namely, whether he was a director or merely a manager of a subdivision, and suggested that further inquiry be made into his authority to bind the company contractually. Greengrass failed to follow up on this information also and, again, simply represented to Plaintiffs that the Agreement was legitimate.

The Court has no doubt that Greengrass's failures to confirm such critical information as the ability of a contract principal to perform the services provided for in the contract being negotiated, and to confirm the authority of the purported agent of that principal to so bind the company, coupled with Greengrass's representations to Plaintiffs of actual knowledge on these matters, constitutes reckless behavior. In light of the information supplied by Vlasbloem, following an affirmative though summary investigation in response to a request by Greengrass, the suggestion by Lodderhose to Greengrass that Astek likely would provide reinsurance and that Sartono was authorized to bind Astek was too "flimsy" a basis to make these representations, which were conveyed as though they were known to be truths. In fact,

they were nothing more than expectations and assumptions.

As discussed above, recklessness can "take the place of deliberate intention," *State Street Trust Co.*, 15 N.E.2d at 419, but even intent is established by the undisputed facts. The Court concludes that Greengrass made these representations in furtherance of a desire to arrange a reinsurance contract and secure for himself a broker's fee. There is no evidence that Greengrass and GC had a prior relationship with AI, IR, or Gutierrez. Greengrass knew Gutierrez was present at the Monte Carlo conference because Gutierrez was in quick need of a replacement reinsurer. (Greengrass Dep., at 58–61.) Greengrass states in his deposition that he was "very excited" to be brokering an arrangement involving Astek because of Astek's size and prominence. (*Id.*, at 58.) The Court can conceive of no plausible alternative purpose, and the Defendants offer none, for why Greengrass would have glossed over the concerns raised by Vlasbloem, other than to avoid the possibility that Gutierrez would be discouraged by the news, delay contracting with Astek pending its verification, and possibly find a replacement reinsurer through another reinsurance broker in the interim. Accordingly, the Court finds that no reasonable jury would conclude that the representations at issue were offered for a purpose other than to deceive, insofar as they masked a central concern for Plaintiffs as principals to the Agreement, namely, whether Astek would be bound to provide and could provide the needed reinsurance services, and thereby induced Plaintiffs to enter into the Agreement.

■ Plaintiffs maintain that they "reasonably relied" on these representations and were induced to enter into the Agreement thereby. Defendants respond that the reasonableness of the Plaintiffs' reli-

ance and whether they were induced are questions of fact for a jury. Defendants admit that the Agreement included a collateral arrangement whereby all communication with Astek was to be conducted through GC and Greengrass. (Def.'s 56.1 Statement, at ¶ 13.) Plaintiffs thus had little choice but to rely on Greengrass' representations, themselves being contractually barred from contacting Astek directly to inquire about its reinsurance practice and Sartono's authority to bind the company. Further, Plaintiffs from the outset of the Agreement repeatedly asked, through Greengrass and GC, for the financial, governmental, and corporate documents they needed to fulfill their contractual obligation of registering Astek as a reinsurer in various agreed upon parts of the world. These documents would have corrected Greengrass's misrepresentations; however, the documents were never provided.

For these reasons, the Court concludes that no rational jury would find that Plaintiffs' reliance on the misinformation supplied by Greengrass and GC was unreasonable. The Court also finds that no reasonable jury would conclude that Plaintiffs were not induced to enter into the Agreement by these misrepresentations for reasons already discussed, namely, the fact that Astek's ability to provide reinsurance services and to be contractually bound by Sartono lie at the crux of Plaintiffs' need to procure replacement reinsurance services. If doubt existed on either point, it is reasonable to infer that Plaintiffs would not have contracted with Astek.

Accordingly, the Court finds that there is no issue of material fact regarding Plaintiffs' claim of common law fraud as against Greengrass. Furthermore, because Greengrass was acting in furtherance of business and within the scope of his authority as an officer, director, and owner of GC, the same conclusion applies

as against GC. *See Sports Car Centre of Syracuse, Ltd. v. Bombard,* 249 A.D.2d 988, 672 N.Y.S.2d 201, 203 (1998); *Forester v. State of New York,* 169 Misc.2d 531, 645 N.Y.S.2d 971, 974 (N.Y.Ct.Cl.1996); *see also Ingram v. Machel and Jr. Auto Repair, Inc.,* 148 A.D.2d 324, 538 N.Y.S.2d 539, 541 (1989) (officers and agents do not avoid personal liability because they were acting on behalf of a corporate principal).

■ With respect to defendants Cooper and Smith, however, the evidence is insufficient to establish whether they had knowledge of the information supplied by Vlasbloem. Vlasbloem told Greengrass that Astek was "very likely" to expand its practice to include international reinsurance when Greengrass "personally spoke" with him on the subject, (Greengrass Dep., at 54–57), and the fax that included a warning about Sartono's credentials with and authority to bind Astek was sent to GC but addressed to Greengrass specifically, (Keough Decl., at App. 2, Ex. GC 36). The Court finds no evidence in the present record, and Plaintiffs identify none, to suggest that Smith or Cooper were present during this conversation between Greengrass and Vlasbloem, that either of them read Vlasbloem's fax to Greengrass, or that either of them otherwise had knowledge of these issues. Accordingly, to the extent that Cooper or Smith represented to Plaintiffs that the Agreement with Astek was legitimate and viable, there is no evidence that either of them had reason to suspect otherwise. Therefore, the Court concludes that Plaintiffs are not entitled to summary judgment for common law fraud against Cooper and Smith because issues of fact exist regarding the extent of their knowledge at the time any representations attributable to them were made.

## C. *NEGLIGENT MISREPRESENTATION*

■ Plaintiffs next assert a claim of negligent misrepresentation. "Once informed of [Vlasbloem's] statement casting doubt on Astek's authority, GC was duty-bound to disclose such material facts to plaintiffs.... Rather than disclose such information, GC, as broker in the transaction owing a duty of care to plaintiffs, at best carelessly represented to plaintiffs that Astek had the requisite authority." (Pl.'s Brief, at 7.) Under New York law, the elements for a negligent misrepresentation claim are that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 19 (2nd Cir.2000) (citing *King v. Crossland Savs. Bank,* 111 F.3d 251, 257–58 (2nd Cir. 1997)).

■ The "special relationship" component requires a closeness approximating privity. *See Securities Investor Protection Corp. v. BDO Seidman, L.L.P.,* 95 N.Y.2d 702, 723 N.Y.S.2d 750, 746 N.E.2d 1042, 1048 (2001). In *Kimmell v. Schaefer,* 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450, 454 (1996), the New York Court of Appeals elaborated on this requirement of a special relationship.

> Since a vast majority of commercial transactions are comprised of ... 'casual' statements and contacts, we have recognized that not all representations made by a seller of goods or provider of services will give rise to a duty to speak

with care .... Rather, liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.... In order to impose tort liability here, there must be some identifiable source of a special duty of care. The existence of such a special relationship may give rise to an exceptional duty regarding commercial speech and justifiable reliance on such speech.

The Court of Appeals further indicated that, given the nature and caliber of the relationship between the parties, whether the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact. In determining whether justifiable reliance exists in a particular case, the Court of Appeals propounded the following: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.*

■ The Court concludes that an issue of fact exists as to the nature of the relationship between Plaintiffs and Greengrass and GC, together with Cooper and Smith. To begin, the Court notes that the arrangement whereby all communication by Plaintiffs to Astek had to route through Greengrass and GC is strongly suggestive of a special relationship given that it restricts Plaintiffs' available sources of information pertaining to the Agreement, which, in turn, reasonably imposes on Greengrass and GC a duty to speak with care. Nonetheless, the record also contains evidence suggesting that GC and Greengrass had a business relationship with Lodderhose and, ostensibly, Astek, that was considerably closer than their relationship with Plaintiffs. First, Lodderhose and Greengrass's business relationship predated the Monte Carlo conference, when Greengrass's relationship with Plaintiffs essentially commenced. Second, Lodderhose, who was Astek's agent, appears to have been a source, if not, the originator, of the arrangement restricting communication with Astek through GC; he, not Greengrass or GC, first conveyed this restriction to Plaintiffs in a fax to Gutierrez dated December 19, 1995. (Keough Decl., at App. 2, Ex. G.) Third, Greengrass vouched for Astek as a legitimate reinsurer to Plaintiffs while the Agreement was being negotiated. Fourth, GC and Greengrass received premium payments from Plaintiffs on behalf of Lodderhose and, ostensibly, Astek. Fifth, Greengrass and GC drew their commission from these premium payments and were not paid directly by Plaintiffs. (Pl.'s Brief, at 8.) Indeed, Plaintiffs admit that Greengrass and GC were purported agents of Astek. (*Id.*)

■ Whether a special relationship exists depends on the related considerations of a basis for special trust and a closeness of the relevant parties that approaches privity. *See Kimmell,* 652 N.Y.S.2d 715, 675 N.E.2d at 454; *Securities Investor Protection Corp.,* 723 N.Y.S.2d 750, 746 N.E.2d at 1048. Here, the communication restriction weighs in favor of a requirement of trust and a duty to speak with care, but Greengrass and GC's ties to Lodderhose and Astek, the principal opposite Plaintiffs in the Agreement, weighs against a closeness approaching privity between GC and Greengrass and Plaintiffs. Reconciling these countervailing considerations constitutes an issue of fact. *See Kimmell,* 675 N.E.2d at 454.

Greengrass, GC, Cooper, and Smith clearly were involved in bringing the principals together and negotiating the Agreement, and, in the process, they did assist Plaintiffs in their effort to secure what Plaintiffs believed to be a legitimate contract for reinsurance services. Because of the verbal and somewhat ad hoc nature of many of the arrangements collateral to the written slip agreement, however, the precise roles and relationships between Plaintiffs and Greengrass and GC, as well as Cooper and Smith, remain unclear. A more complete understand of these roles and relationships, in particular, additional evidence suggestive of the presence or absence of a basis for trust or a closeness approaching privity, is necessary to resolve the question whether a special relationship existed between Plaintiffs and Greengrass and GC, together with Cooper and Smith. Accordingly, Plaintiffs' motion for summary judgment on their claim of negligent misrepresentation must fail, as an issue of fact exists regarding an essential element, namely, the presence of a "special relationship."

D. *CONVERSION*

 Plaintiffs next assert a claim of conversion against Greengrass and GC, together with Cooper and Smith. In order to state a cause of action for conversion under New York law, a plaintiff must establish "legal ownership of a specific identifiable piece of property and the defendant's exercise of domination over or interference with the property in defiance of the plaintiff's rights." *Di Siena v. Di Siena,* 266 A.D.2d 673, 698 N.Y.S.2d 93, 95 (1999) (citation omitted; internal quotations omitted). The tort of conversion is established "when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner."

*Key Bank of New York v. Grossi,* 227 A.D.2d 841, 642 N.Y.S.2d 403, 405 (1996).

The extent of Plaintiffs' argument in support of their conversion claim is as follows: "The same facts [alleged regarding common law fraud and negligent misrepresentation] establish that GC converted plaintiffs' payments by not performing as agreed and by not returning the funds." (Pl.'s Brief, at 8.) The performance Plaintiffs mention likely refers to Greengrass and GC's agreement to supply Plaintiffs with the corporate, financial, and governmental documents necessary to register Astek as an international reinsurer in the parts of the world where Astek ostensibly would be providing such services pursuant to the Agreement. Alternatively, the performance may refer to Plaintiffs' allegation that "[t]he GC defendants failed to pay the premiums due for the excess of loss insurance, and consequently that policy lapsed." (Pl.'s Statement, at ¶ 32.)

 With respect to the former understanding, Greengrass and GC's "not performing as agreed," namely, not providing the specified documents, is not a proper basis for a conversion claim. As discussed, conversion concerns the unlawful exercise of control over or interference with another's property. Payment for services inadequately rendered sounds in breach of contract. With respect to the second understanding, while someone to whom a sum of money is remitted on condition that it be treated in a particular manner and who fails to treat the money as prescribed can be liable for conversion, *see Key Bank of New York,* 642 N.Y.S.2d at 405, the Court notes that an issue of fact exists as to whether GC properly forwarded the premium payments in that the Defendants claim that "[t]hese premiums were not paid, in part, because of plaintiffs' failure to provide premium payments in a

timely manner." (Def.'s 56.1 Statement, at ¶ 32.)

Furthermore, irrespective of which understanding of the term "performing" Plaintiffs intended in stating their conversion claim, the Court notes that in a letter dated December 19, 1995 addressed to Gutierrez, Lodderhose explained that "[a]ny commitments made by GC Intermediaries on behalf of PT Astek shall be deemed to have been made by PT Astek itself. The GC authority for PT Astek includes premiums and claims. Therefore, all premiums due to PT Astek from [IR] or Anglo–Iberia Underwriting Management Co. shall be made to GC. *Receipt of such funds by GC shall be deemed as receipt by PT Astek itself.*" (Keough Decl., at App. 2, Ex. G (emphasis added).) Accordingly, GC was acting as an agent of Astek when it received premium payments, and any agreement for services by GC and Greengrass to Plaintiffs is inapposite because, even assuming Greengrass and GC's "not performing as agreed" can constitute interference with property, that property, the premium sums, no longer belonged to Plaintiffs at the time of the alleged failure of performance. *See Di Siena,* 698 N.Y.S.2d at 95 ("Here, plaintiff relinquished his ownership rights to his shares prior to the time of the alleged conversion and, therefore, he cannot maintain a conversion action."). For these reasons, Plaintiffs' motion for summary judgment as to their claim of conversion must fail.

### E. *BREACH OF CONTRACT*

█ Finally, Plaintiffs claim that Greengrass and GC, along with Cooper and Smith, breached their contractual obligations to Plaintiffs insofar as they failed to supply Plaintiffs with certain corporate, financial, and governmental documents Plaintiffs needed to register Astek as an international reinsurer with specified countries pursuant to the Agreement. This argument presupposes that a contract between Plaintiffs and Defendants existed. The Court concludes that whether such a contract in fact existed is an issue of fact that remains in dispute.

The Plaintiffs admit that Greengrass and GC were agents of, purportedly, Astek. (Pl.'s Brief, at 8.) Greengrass and GC received premium payments on behalf of Lodderhose and, ostensibly, Astek, and Plaintiffs admit that Greengrass and GC were paid commission not by Plaintiffs but by Lodderhose and Astek out of the premium monies GC received on their behalf, (*Id.*) Furthermore, Greengrass had a professional relationship with Lodderhose that predated his business relationship with Plaintiffs. Additionally, Greengrass asserts that he and GC were independent players in the negotiations and transactions surrounding the Agreement and explicitly denied having any agreement with Plaintiffs to act for them in any capacity. These facts suggest that any contractual duty Defendants had was owed to Lodderhose and, ostensibly, Astek, rather than to Plaintiffs. At a minimum, they create an issue of fact as to whether any contractual obligations existed as between Plaintiffs and Greengrass, GC, Cooper, and Smith. Accordingly, Plaintiffs are not entitled to summary judgment on their breach of contract claim.

### III. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that Plaintiffs' motion for summary judgment as to their claim of common law fraud against defendant Peter I. Greengrass is GRANTED; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment as to their claim of common law fraud against defendant GC Insurance Brokers Limited, formerly

known as GC Intermediaries Limited, is GRANTED; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment as to their claim of common law fraud against defendant Leslie J. Cooper is DENIED; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment as to their claim of common law fraud against defendant A.J. Smith is DENIED; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment as to their claims of negligent misrepresentation, conversion, and breach of contract against defendants Peter I. Greengrass, GC Insurance Brokers Limited, formerly known as GC Intermediaries Limited, Leslie J. Cooper, and A.J. Smith is DENIED.

**SO ORDERED.**