OPINION OF THE COURT
Shirley Werner Kornreich, J.
The instant actions concern the Metropolitan Museum of Art’s “pay what you wish” admissions policy. At the heart of these cases is whether this policy and the manner in which it is enforced runs afoul of General Business Law § 349, a nineteenth-century statute which provided funding to the Museum, and the lease between the Museum and the City of New York, executed in 1878. The Museum now moves to dismiss plaintiffs’ causes of action based on the statute and the lease. The Museum’s motion is granted for the reasons that follow.
I. Procedural History
On November 14, 2012, plaintiffs Theodore Grünewald and Patricia Nicholson commenced an action against the Museum and its directors, seeking injunctive relief. Their complaint (the Grünewald complaint) states six causes of action: (1) breach of the lease (asserted as purported third-party beneficiaries) by failing to provide free admission; (2) violation of chapter 476 of the Laws of 1893 (the 1893 act) by charging admission; (3) violation of General Business Law § 349 regarding admission costs; (4) misrepresentation regarding admission costs; (5) injunctive *550 relief compelling the Museum to “restore the Central Park entrance”; and (6) injunctive relief compelling the Museum to comply with environmental regulations necessary so that construction of the Central Park entrance can begin. The Grünewald complaint does not seek monetary damages. Defendants filed an answer to the Grünewald complaint on March 14, 2013.
Meantime, on March 5, 2013, plaintiffs Filip Saska and Tomá Nadrchal, residents of the Czech Republic, and plaintiff Stephen Michelman, a New York resident, commenced a putative class action against the Museum based on allegations that are virtually identical to those alleged in the Grünewald complaint concerning admission costs. Their complaint (the Saska complaint) states four causes of action: (1) violation of General Business Law § 349; (2) breach of the lease (asserted as purported third-party beneficiaries); (3) violation of the 1893 act; and (4) misrepresentation. The Saska complaint demands both injunctive relief and monetary damages.
On April 26, 2013, the Museum filed the instant motion, which seeks dismissal of the second and third causes of action in the Saska complaint. Shortly thereafter, plaintiffs’ counsel in the Grünewald action requested that the Museum move to dismiss the corresponding causes of action in the Grünewald complaint (the first and second). On June 14, 2013, the Museum moved to dismiss those claims. The Museum, which is represented by the same counsel in both actions, filed a brief that closely resembles the one filed in the Saska action. Motion practice followed and included the Grünewald plaintiffs’ cross motion to dismiss the Museum’s first, fourth, sixth, and seventh affirmative defenses, which relate to the claims the Museum moved to dismiss. The Saska and Grünewald plaintiffs made substantially the same arguments in their papers. A joint hearing on the motions was held on September 24, 2013. Counsel for the Saska plaintiffs addressed the lease, and counsel for the Grünewald plaintiffs addressed the 1893 act.
II. Factual Background
On these CPLR 3211 motions, the facts recited herein are taken from the two complaints[1] and the documentary evidence and relate to plaintiffs’ claims under the 1893 act and the lease.
*551 On July 21, 1853, Central Park was created and established pursuant to chapter 616 of the Laws of 1853. (GC ¶ 19.) On April 18, 1870, the New York State Legislature[2] created the Museum “for the purpose of . . . encouraging and developing the study of the fine arts, and the application of arts to manufacture and practical life, of advancing the general knowledge of kindred subjects, and, to that end, of furnishing popular instruction and recreation.” (L 1870, ch 197, § 1.) The act establishing the Museum was later amended to classify the Museum as “an educational corporation.” (L 1908, ch 219, § 2.) Further, in an amendment of the New York City Charter in 1922, the Museum was referred to as “an adjunct of the educational system of the city.” (L 1922, ch 517, § 1.)
On April 5, 1871, the legislature authorized the Parks Department to build the Museum in Central Park. (GC ¶ 20.) On June 13, 1873, the legislature authorized the Parks Department to construct the Museum buildings “on any part of the central park” and use any moneys authorized for the Park’s maintenance up to $30,000. (L 1873, ch 756, § 7.) An 1876 statute authorized the Department of Parks to contract with the Museum for the buildings and set forth the park space allotted. (L 1876, ch 139, § 2.) There followed a number of statutes providing for enlargement and reconstruction of the Museum and allocation of funds, all under the auspices of the Parks Department. (L 1878, ch 385; L 1881, ch 375; L 1884, ch 447; L 1885, ch 106; L 1887, chs 575, 579, 581; L 1889, ch 513; L 1893, chs 276, 476; L 1897, chs 638, 671; L 1900, ch 14; L 1901, ch 67; L 1904, ch 108; L 1905, ch 27; L 1907, ch 517.)
In 1892, the state legislature enacted a law “to authorize further appropriation for the maintenance of” the Museum, authorizing the Parks Department to apply for funding of up to $70,000 each year for the Museum, in addition to money already authorized, provided that the Museum “be kept open and accessible to the public hereafter free of all charge throughout the year, including Sunday afternoons and two evenings in each week.” (GC ¶ 42; L 1892, ch 419, § 1 [emphasis added].) After this law was enacted, the Museum expressed concern that free access for the entire week would impose a financial hardship on it. (GC ¶ 43.) As a result, the following year, in 1893, the state legislature enacted the 1893 act (never codified), which provides:
*552 “[The Parks Department] is hereby authorized to apply in each year for the keeping, preservation and exhibition of the collections in the buildings in Central Park that are now or may be hereafter occupied by [the Museum], in addition to the sum or sums now authorized by law for such purposes, such further sum not exceeding $70,000, upon condition that the collections in [the Museum] shall be kept open and accessible to the public hereafter free of charge throughout the year for five days each week, one of which shall be Sunday afternoon and also for two evenings in each week.” (GC ¶ 44.)
In 1906, the legislature authorized “a further appropriation for the maintenance of’ the Museum, of $50,000. (L 1906, ch 344 [emphasis added].) That act was amended in 1915 to permit an annual, discretionary sum or sums to be allocated to the Museum as deemed necessary by the Parks Department. (L 1915, ch 156.) Neither piece of legislation mentioned free admission.
In the midst of this legislative activity, on December 24, 1878, the lease was executed, whereby the City granted a perpetual, rent-free lease to the Museum. (GC ¶¶ 34-38.) Article fourthly of the lease provides: “That the exhibit halls of [the Museum] Building shall on Wednesday, Thursday, Friday, and Saturday of each week, and on all legal and public holidays except Sundays, be kept open and accessible to the public free of charge from ten o’clock AM until half an hour before sunset.” (GC ¶ 39.) The lease states, in article eighthly, that if the Museum breaches any of its obligations under the lease, the Parks Department can evict the Museum from the building. (GC ¶ 40.) Article ninthly requires amendments to the lease to be in writing.
In 1970, to address a serious budget deficit, the Museum sought to charge an admission fee so that it could continue to provide the same level of public access in a fiscally responsible manner. The Museum formally requested permission to do so from the Parks Department. In a letter dated October 7, 1970, August A. Heckscher, the Administrator of the Parks Department, wrote the following to Thomas P F. Hoving, the Museum’s Director:
“We have carefully considered your request to institute a general admission fee to the Museum and have no objection to such a program subject, however, to the following conditions:
“1) The amount of the admission fee is left entirely *553 to the individual’s discretion and that advice to that effect be conspicuously posted.
“2) Free admission will be permitted to the Great Hall and South parking lot entrance lobby whenever the Museum is open to the public.
“3) No other special or internal charges for admission are to be levied while this program is in effect.
“4) That this be considered an experimental program for a period not to exceed six (6) months in any event.
“5) If after six (6) months, if the general admission policy has proven satisfactory to both the Museum and [the Parks Department] we shall initiate appropriate steps to formalize the program. This shall be in the form satisfactory to [the Parks Department] and the Corporation Counsel and any other agency of appropriate jurisdiction.
“6) The proceeds derived from this program shall be used by the Museum for operating expenses only.” (Affirmation of Meredith B. Esser, dated Apr. 26, 2013 [Esser affirmation], exhibit B.)
In a letter dated February 9, 1971, C. Douglas Dillon, the Museum’s President, reported to Heckscher on the progress of the admission program. (Esser affirmation, exhibit C.) In a letter dated March 9, 1971, Hoving asked Heckscher’s permission to implement the admission program on a permanent basis. (Esser affirmation, exhibit D.) Heckscher responded to Hoving in a letter dated March 30, 1971:
“I have written to the Corporation Counsel asking that he prepare an amendment to the Museum’s lease in order to formally sanction the plan. In the meantime, you have my approval to continue the plan beyond the April 7, 1971 expiration date until such time as the Corporation Counsel has completed his work.” (Esser affirmation, exhibit E.)
Approximately four years later, in a letter dated July 17, 1975, the new Commissioner of the Parks Department, Edwin L. Weisl, wrote to Hoving:
“We have been receiving letters to this agency and from the Mayor’s office concerning the wording of your signs asking for donations from those who enter the museum. Some claim that the signs read ‘You Must Contribute Something’ in order to get in. “Perhaps the signs could make it a bit more clear *554 that contributions are voluntary.” (Exhibit 9 to the Grünewald Opp.)
Hoving responded to Weisl in a letter dated August 6, 1975:
“I . . . want to set straight what may be a misunderstanding. It is true that the signs in the Museum indicate that the visitor must contribute something. Specifically, the signs read ‘Pay what you wish but you must pay something’. This has been the Museum’s position since the discretionary admissions policy was first adopted in the fall of 1970.
“As I am sure your files will indicate, [discussion of the letters quoted above]. At that time, [Heckscher] indicated that he would request the Corporation Counsel’s office to prepare an amendment to the Museum’s lease to formally sanction the plan, but this was never done because it was found that under the Museum’s lease from the City, the forgoing exchange of correspondence was itself sufficient.
“Over the years since we instituted the discretionary admissions policy, we have from time to time had visitors who insist upon their right to pay one cent. Under the policy this is perfectly permissible, although of course it does nothing to achieve our purposes of keeping down the annual deficit in operating funds. Most of our visitors are more generous and appreciative, however, so that the average contribution from those not admitted free anyway (such as members, students, children, persons over age 65, servicemen, etc.) fluctuates between about $.85 and $.95 per person.” (Supplemental affirmation of Meredith B. Esser, dated July 12, 2013, exhibit A [emphasis added].)
No formal written amendment to the lease was executed, until the instant motions were sub judice.[3] There is nothing in the record as to why this was not done, other than Hoving’s 1975 letter to Weisl.
*555 It is undisputed that the City, Corporation Counsel, and the Parks Department have known the details of the Museum’s admission policy since it was instituted in 1970. Indeed, from time to time, the Museum has requested, and the City has approved, changes to the recommended admission payments. The most recent approval came from Kate D. Levin, the Commissioner of Cultural Affairs, in a letter to defendant Emily Rafferty, the Museum’s current President, dated February 22, 2011:
“I am writing in response to your request to increase the general suggested admission fees at [the Museum] . . . We applaud the continued commitment of the Museum to maintain its suggested admission policy, that all 25 special exhibits the Museum mounts each year are free to the public with general admission, and the fact that all New York City schools groups may access the Museum free of charge. We also acknowledge that you have not changed your admission fee structure since 2006.
“We understand that this proposed increase is part of the Museum’s efforts to build earned income streams, and, in light of the currently challenging economic environment, we appreciate the Museum’s thoughtful and prudent budgeting practices.
“On the basis of these considerations, we approve your request.” (Esser affirmation, exhibit F.)
As these letters indicate, the Museum does not allow members of the public to enter for free (with certain exceptions).[4] Rather, all members of the public must pay at least a penny to enter. The Museum advertizes a suggested admission price, which has changed over time and varies depending on whether the visitor is a senior or student. For the purpose of this decision, all that matters is the undisputed fact that admission is not free for all, since admission will not be granted unless the visitor pays something.
The City is not before this court. Therefore, the relevant inquiry is whether plaintiffs have standing to sue the Museum for its failure to admit all members “free of charge,” which they argue violates the 1893 act and the (pre-Oct. 21 version of the) lease. The Museum contends that: (1) there is no private right *556 of action under the 1893 act;[5] and (2) defendants cannot sue for breach of the lease as third-party beneficiaries. The court agrees with the Museum on both issues.
III. Discussion
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. (Amaro v Gani Realty Corp., 60 AD3d 491 [1st Dept 2009]; Skillgames, LLC v Brody, 1 AD3d 247, 250 [1st Dept 2003], citing McGill v Parker, 179 AD2d 98, 105 [1992]; see also Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998].) The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged, the complaint states the elements of a legally cognizable cause of action. (Skillgames at 250, citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977].) Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. {Amaro, 60 AD3d 491.) “However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration.” (Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-N.Y. News Syndicate, 204 AD2d 233 [1st Dept 1994].) Moreover, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if “the documentary evidence utterly refutes plaintiff’s factual allegations, conclusively establishing a defense as a matter of law.” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002] [citation omitted]; Leon v Martinez, 84 NY2d 83, 88 [1994].)
A. Plaintiffs’ Claim under the 1893 Act
“It goes without saying that not every violation of a statutory provision is actionable by a person aggrieved by the breach.” (Gerel Corp. v Prime Eastside Holdings, LLC, 12 AD3d 86, 90 [1st Dept 2004].) Where, as here, the statute under which plaintiffs sue “does not explicitly provide for a private cause of action, recovery may be had under the statute only if a legislative intent to create such a right of action is ‘fairly implied’ in the statutory provisions and their legislative history.” {Brian *557 Hoxie’s Painting Co. v Cato-Meridian Cent. School Dist., 76 NY2d 207, 211 [1990], citing Sheehy v Big Flats Community Day, 73 NY2d 629, 633 [1989].) The Court of Appeals has established a three prong test to determine whether a private right of action exists under a statute: “(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme.” (Sheehy, 73 NY2d at 633; accord Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d 314, 329-331 [1983].)
It is clear that plaintiffs are part of the class which the 1893 act was intended to benefit. Indeed, the 1893 act was intended to benefit both plaintiffs and the Museum. Specifically, it was enacted to educate and enlighten New York City’s citizenry, foster commerce and trade, and provide funding to the Museum so that it could afford to provide free access to the public. However, by 1970, inflation, legislative inaction, and budgetary constraints eroded the efficacy of the 1893 act’s goal. By that point, and even more so today, $70,000 was simply not enough to fund the cost of providing free access to the public while maintaining the quality and quantity of the Museum’s vast art collection. Consequently, the relevant inquiry is not as narrow as plaintiffs proffer — namely, whether charging an admission fee guts the 1893 act’s purpose of providing free access to the public. Rather, the real question is whether the goal of the 1893 act — providing a mechanism to make access free for the public and affordable for the Museum in order to educate and foster commerce — is furthered by allowing plaintiffs to stop the Museum from charging admission, when doing so would put the Museum’s ability to provide the current level of access in jeopardy. The answer is no.
All members of the public can afford to visit the Museum under the present scheme. For those without means, or those who do not wish to express their gratitude financially, a de minimis contribution of a penny is accepted. Admission to the Museum is de facto free for all. Actual access, provided in a way that “nudges” visitors to donate, is not incompatible with the 1893 act. Such a policy furthers the goal of the 1893 act— providing sufficient funding to ensure access to all. On the other hand, plaintiffs’ lawsuit, at best, would undermine the ability of the Museum to provide free access on five days (including Sunday afternoon) and two evenings per week. At worst, it *558 might well push the Museum to charge for exhibitions, which might include a substantial percentage, if not the majority, of the art on exhibit. A large part of the Museum’s operating funding would be cut and the objective of educating the public and encouraging commerce undermined. This is a sufficient reason to dismiss plaintiffs’ cause of action under the 1893 act.
However, beyond the tripartite standing test, dismissal is also mandated by the fact that the court finds the 1893 act, defined in its title as an appropriations act, to be just that. Plaintiffs cannot sue under an appropriations statute when the government has the remedy of denying funding. Here, where the amount of funding is not mandatory ($70,000 is the maximum amount), the government could simply choose to deny that funding for any reason, including the Museum’s failure to provide free admission. This makes the funding a matter of government discretion, not part of a consumer protection, regulatory scheme. (Cf. Lino v City of New York, 101 AD3d 552 [1st Dept 2012] [finding private right of action under statute that requires sealing of juvenile criminal records].) The cases cited by plaintiffs to support their contention that courts regularly infer private rights of action where the government, as an enforcement mechanism, can withhold funds, are inapposite. These cases involve federal law where the legislative history evidences congressional intent to create a private right of action or where other federal statutes (such as 42 USC § 1983) create such a right. (See e.g. Cannon v University of Chicago, 441 US 677 [1979].)
The courts would be flooded with litigation if private rights of action were routinely permitted under appropriation statutes, since there are thousands of such statutes. Every time a single, dissenting citizen takes offense at the way the government exercises its power of the purse, the government would be forced, at great expense (which, of course, is paid with the public’s tax dollars), to defend this predictable deluge of litigation, regardless of its merit.
That being said, here, the legislative history suggests that the 1893 act may have been somewhat different than typical appropriations statutes, since it was the product of political negotiations aimed at providing the public with free access to the Museum in exchange for operating funds. Nonetheless, the question of whether this matters does not need a resolution, since, for the reasons discussed herein, plaintiffs’ claim under the 1893 act contravenes the legislative purpose because the result of their claim would be the precise funding problem that the statute was meant to remedy.
*559 B. Plaintiffs’ Third-Party Beneficiary Claim under the Lease
“A party asserting rights as a third-party beneficiary must establish ‘(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.’ ” (State of Cal. Pub. Employees’ Retirement Sys. v Shearman & Sterling, 95 NY2d 427, 434-435 [2000], quoting Burns, 59 NY2d at 336.)
New York has adopted the standard set forth in section 302 of the Restatement (Second) of Contracts to determine if a party was an intended beneficiary:
“One is an intended beneficiary if one’s right to performance is ‘appropriate to effectuate the intention of the parties’ to the contract and either the performance will satisfy a money debt obligation of the promisee to the beneficiary or ‘the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.” (See Edge Mgt. Consulting, Inc. v Blank, 25 AD3d 364, 368 [1st Dept 2006] [emphasis added].)
Additionally, “the parties’ intent to benefit the third party must be apparent from the face of the contract.” (LaSalle Natl. Bank v Ernst & Young, 285 AD2d 101, 108 [1st Dept 2001]; see also U.S. Bank N.A. v GreenPoint Mtge. Funding, Inc., 105 AD3d 639, 640 [1st Dept 2013] [dismissing third-party beneficiary claim because of “the absence of any clear language on the face of the (contracts)”].) “Absent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent.” (LaSalle, 285 AD2d at 108-109, citing Fourth Ocean Putnam Corp. v Interstate Wrecking Co., 66 NY2d 38, 45 [1985].) Most important, a third-party beneficiary “has no greater rights or remedies than the direct parties to [a contract].” (Ambac Assur. Corp. v EMC Mtge. LLC, 39 Misc 3d 1240[A], 2013 NY Slip Op 50954[U], *4-6 [Sup Ct, NY County 2013, Ramos, J.]; BAII Banking Corp. v UPG, Inc., 985 F2d 685, 697 [2d Cir 1993], citing Dunning v Leavitt, 85 NY 30, 35 [1881] [“it would be contrary to justice or good sense to hold that (a third-party beneficiary) should acquire a better right against the promisor than the promisee himself had”].)
*560 There is nothing special about the Museum’s lease that differentiates it from a conventional commercial lease, other than the fact that the City is the landlord and that the tenant, the Museum, is allowed to occupy the premises rent free. In virtually all commercial leases, the tenant’s occupancy is conditioned on more than the payment of rent. Typically, the tenant is required to abide by various conditions, such as limitations of the use of the premises (e.g. use clause, certificates of occupancy and zoning laws), maintaining insurance (such as workers’ compensation), and generally abiding by all applicable laws. (See e.g. Waldbaum, Inc. v Fifth Ave. of Long Is. Realty Assoc., 85 NY2d 600, 603 [1995].) If the tenant breaches any of these contractual obligations, the landlord can serve a cure notice and, if the breaches are not timely cured, or a Yellowstone injunction is not obtained, the landlord can bring a holdover proceeding to evict the tenant. (See id. at 606 [“a breach of one of the tenant’s obligations under the lease is not ipso facto a default under the lease. By definition, an event of default does not occur under the lease until the tenant has failed to effect a cure of the nonperformance of the obligation within the appropriate cure period after notice”].)
Likewise, in this case, the lease provides for such a procedure. Article eighthly contains a protocol for the City to provide a cure notice and evict the Museum if it breaches the lease. The City has never done so. To the contrary, the City, which has always known that the Museum has been charging an admission fee, has never objected to such practice. For more than 40 years, the City has consistently sanctioned the Museum’s admission policy. The policy began with the Parks Department’s explicit approval and still continues to be overseen by the Commissioner of Cultural Affairs, who has approved the exact amounts of the Museum’s suggested donations. The notion that the City maintains that the Museum is breaching the lease is belied by the City’s actions.[6]
That being said, the City’s actions do not necessarily constitute a waiver of its rights to enforce the express terms of the lease. Certainly, there are insufficient facts on this motion to make such a determination. (See Boston Concessions Group v Criterion Ctr. Corp., 200 AD2d 543, 545 [1st Dept 1994] [“the establishment of a waiver ... is ordinarily a question of fact”]; see also Peck v Peck, 232 AD2d 540, 540 [2d Dept 1996] [“waiver *561 is not created by negligence, oversight, or thoughtlessness, and cannot be inferred from mere silence”].) Then, too, the court cannot reach the issue of whether the City might be estopped from enforcing the free admission requirement, as the court cannot rule on such issue when the City is not a party to this action. (CPLR 1001 [a]; Genger v Genger, 87 AD3d 871, 874 [1st Dept 2011].) In any event, estoppel against the government is “foreclosed ‘in all but the rarest cases.’ ” (Matter of New York State Med. Transporters Assn, v Perales, 77 NY2d 126, 130 [1990], quoting Matter of Parkview Assoc. v City of New York, 71 NY2d 274, 282 [1988].)[7] Most important, the court will not rule on whether the Parks Department has the authority to and did modify the lease without the City’s presence, though, again, this issue appears to be moot. In any event, the City need not be dragged into this case, since such issues do not need a resolution to dismiss this claim.
Assuming, arguendo, that plaintiffs are intended beneficiaries of the lease, they still cannot compel specific performance that differs from the remedy provided for in the lease. Third-party beneficiaries do not have contractual rights that go beyond or contravene the explicit terms of the contract. To wit, if the City were before this court, it would not get the injunctive relief requested by plaintiffs. Rather, service of a proper notice to cure and, if no cure takes place, eviction, is the remedy under the lease.[8] Plaintiffs’ rights as alleged third-party beneficiaries are no greater than those of the City.
Further, on this record, there is little (and, after the amendment, no) doubt that the City has no desire to evict the Museum for the conduct alleged in this action. Plaintiffs should not be permitted to disregard the contracting party’s decision as to the benefits it seeks to gain from its contract and the enforcement benefits it negotiated to achieve those benefits. In other words, plaintiffs cannot force the Museum to abide by the terms of the lease in a manner that contravenes the express wishes of its landlord. This is particularly the case here, where the public has de facto free access. Compelling the payment of a penny instead of providing free access is not a material breach, espe *562 dally, where, as here, the City has explicitly stated that it “ applaud [s] the continued commitment of the Museum to maintain its suggested admission policy” and “appreciate^] the Museum’s thoughtful and prudent budgeting practices.”
To the extent that plaintiffs are intended third-party beneficiaries of the lease, they overstate the degree to which the City intended to confer such status onto them. “In determining whether a third party was an intended beneficiary to a contract, the actual intent of the parties is critical. The best evidence of the contracting parties’ intent is the language of the agreement itself.” (Edge Mgt., 25 AD3d at 368-369 [emphasis added].) Here, nothing in the lease suggests that the City intended for members of the public who disagree with the City’s policies regarding the Museum to be allowed to circumvent the City’s wishes by suing the Museum directly. Indeed, the lease permits the City and the Museum to execute written amendments, a right they recently exercised. The lease does not require the public’s approval to do so. It would be ludicrous for there to be such a requirement, especially when there are political remedies that members of the public can avail themselves of if they disapprove of the City’s policies. (Cf. Roberts v Health & Hosps. Corp., 87 AD3d 311, 326 [1st Dept 2011] [“Neither the petitioners nor the courts should be permitted to substitute their judgment for the discretionary management of public business by public officials, as neither have been lawfully charged with that responsibility . . . Petitioners, ‘however sincerely motivated, may not interpose themselves and the courts into the management and operation of public enterprises’ ”], quoting Jones v Beame, 45 NY2d 402, 407 [1978].)
For these reasons, plaintiffs cannot maintain a claim against the Museum under the lease. Accordingly, it is ordered that defendants’ motions to dismiss are granted, the Grünewald plaintiffs’ cross motion to dismiss is denied, and the Clerk is directed to: (1) enter judgment under index No. 650775/2013, dismissing the second and third causes of action in the Saska complaint; and (2) enter judgment under index No. 158002/ 2012, dismissing the first and second causes of action in the Grünewald complaint; and it is further ordered that the remaining claims in both actions are hereby severed and shall continue.

. To avoid duplicate citations, the court only cites to the Grünewald complaint, and does so with the following citation: GC ¶ —.

. At the time the statutes at issue were enacted, the legislature was the body empowered to establish and fund the Museum. At present, that power lies with the City.

. On October 21, 2013, the City and the Museum executed an amendment to the lease, whereby the Museum was granted the right to impose a mandatory entrance fee, subject to approval by the City, which “shall not be unreasonably withheld.” (See letter to ct of Bruce R. Kelly, dated Oct. 24, 2013 [New York State Courts electronic filing Doc. No. 43].) Not only does this amendment not alter the analysis in this decision, if anything, it bolsters the court’s ruling (in Part III.B) that plaintiffs cannot maintain a third-party beneficiary claim for specific performance under the lease. However, in this deci *555 sion, the court will not speculate about the degree to which the amendment may either moot or preclude some of the claims in these cases. This will be addressed at the preliminary conference, scheduled below.

. Of course, this may change as a result of the lease’s recent amendment.

. The court does not reach the Museum’s argument that the 1893 act has been superseded by subsequent appropriations statutes, which do not condition funding on free admission. Since, as discussed in Part III.A, there is no private right of action under the 1893 act, plaintiffs’ cause of action fails.

. Of course, such notion has been put to rest now that the lease’s amendment explicitly allows for an admission fee.

. An exception, which may or may not apply here, is where the City acts “in a proprietary and not in a governmental capacity.” (Atkin’s Waste Materials v May, 34 NY2d 422, 427 [1974].)

. Of course, the threat of eviction can, and often does incentivize a tenant to cure. When a commercial tenant breaches its lease, a court does not use the threat of a contempt order for violating an injunction. It issues an eviction order.