*Loreley v. Wells Fargo*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2020
No. 19-3304

LORELEY FINANCING (JERSEY) NO. 3 LIMITED, LORELEY FINANCING
(JERSEY) NO. 5 LIMITED, LORELEY FINANCING (JERSEY) NO. 15
LIMITED, LORELEY FINANCING (JERSEY) NO. 28 LIMITED, AND
LORELEY FINANCING (JERSEY) NO. 30 LIMITED,
*Plaintiffs-Appellants,*

v.

WELLS FARGO SECURITIES, LLC, WELLS FARGO BANK, N.A.,
HARDING ADVISORY LLC, AND STRUCTURED ASSET INVESTORS,
LLC,
*Defendants-Appellees.*[*]

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: APRIL 7, 2021
DECIDED: SEPTEMBER 13, 2021

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

Before: CALABRESI and MENASHI, *Circuit Judges,* and KOELTL, *District Judge.*[†]

The plaintiffs invested in three collateralized debt obligations ("CDOs") created and offered by predecessors-in-interest to certain defendants. Assets for the CDOs were selected according to stringent eligibility criteria by collateral managers who are also defendants here. When the financial crisis hit in 2008, the collateral underlying the CDOs defaulted and the CDOs became worthless. The plaintiffs brought suit for fraud, rescission, conspiracy, aiding and abetting, fraudulent conveyance, and unjust enrichment alleging that the defendants had misrepresented that the collateral managers would exercise independence in selecting assets for the CDOs. The district court granted summary judgment to the defendants. On appeal, the plaintiffs claim to have detrimentally relied on the defendants' misrepresentations that the collateral managers would exercise independence in selecting assets for the CDOs.

We disagree. The plaintiffs based their investment decisions solely on the investment proposals their investment advisor developed. The advisor developed these detailed investment proposals based on offering materials the defendants provided and on the advisor's own due diligence, which included conducting its own risk analyses and asset valuations and vetting the collateral managers. The plaintiffs, who did not directly communicate with the defendants, therefore premise their fraud claims on the advisor's reliance on the defendants' representations. Yet New York law does not support this theory of third-party reliance. Accordingly, we hold

---

[†] Judge John G. Koeltl of the United States District Court for the Southern District of New York, sitting by designation.

that the plaintiffs have failed to establish, by clear and convincing evidence, reliance on the defendants' representations.

We also hold that the plaintiffs have failed to establish that the defendants misrepresented or omitted material information for two of the three CDO deals at issue—the Octans II CDO and the Sagittarius CDO I. The defendants' representations that the collateral managers would exercise independence in selecting assets were not misrepresentations at all; the plaintiffs have identified no evidence that the collateral managers ceded control of asset selection to a non-party hedge fund that was also an investor in the CDOs. Moreover, the evidence indicates that the hedge fund's involvement in asset selection was known to the advisor. The defendants did not have a duty to disclose their knowledge of the hedge fund's investment strategy because this information could have been discovered through the exercise of due care. For these reasons, we **AFFIRM** the judgment of the district court.

---

SHERON KORPUS, Kasowitz Benson Torres LLP, New York, New York (David M. Max, Kasowitz Benson Torres LLP, New York, New York; James M. Ringer, Meister Seelig & Fein LLP, New York, New York; Stephen M. Plotnick, Alexander Malyshev, Carter Ledyard & Milburn LLP, New York, New York, *on the brief*), *for Plaintiffs-Appellants*.

JAYANT W. TAMBE (Laura Washington Sawyer, Rajeev Muttreja, James M. Gross, Amanda L. Dollinger, *on the brief*), Jones Day, New York, New York, *for Defendants-Appellees*.

---

MENASHI, *Circuit Judge*:

In 2006 and 2007, Plaintiffs-Appellants Loreley Financing (Jersey) No. 3 Limited, Loreley Financing (Jersey) No. 5 Limited, Loreley Financing (Jersey) No. 15 Limited, Loreley Financing (Jersey) No. 28 Limited, and Loreley Financing (Jersey) No. 30 Limited (collectively, "Loreley")—five special purpose entities formed for the specific purpose of investing in securities known as collateralized debt obligations ("CDOs")—invested in three CDOs created and offered by Wachovia subsidiaries (collectively, "Wachovia") that were the predecessors-in-interest to Defendants-Appellees Wells Fargo Securities, LLC, Wells Fargo Bank, N.A., and Structured Asset Investors, LLC ("SAI"). The collateral managers for these CDOs—Defendants-Appellees Harding Advisory LLC ("Harding") and SAI—selected assets that met the CDOs' eligibility criteria. When the financial crisis hit in 2008, cash flow into the CDOs ceased and the CDOs became worthless. Loreley sued the defendants for fraud, rescission, conspiracy, aiding and abetting, fraudulent conveyance, and unjust enrichment—alleging that the defendants had misrepresented the collateral managers' independence in selecting assets for the CDOs.

Loreley now appeals to this court, for the second time, from a judgment granting summary judgment to the defendants. Loreley claims to have detrimentally relied on the defendants' misrepresentations that the collateral managers would exercise independence in selecting assets for the CDOs. We disagree. Loreley based its investment decisions solely on the investment proposals developed by its investment advisor, IKB Deutsche Industriebank AG and IKB Credit Asset Management GmbH (collectively, "IKB"). IKB

4

developed these detailed investment proposals based on the defendants' offering materials and on IKB's own due diligence, which included conducting its own risk analyses and asset valuations and vetting the collateral managers. For this reason, Loreley—which did not communicate directly with the defendants—bases its fraud claims on IKB's reliance. Yet New York law does not support such a theory of third-party reliance. *See Pasternack v. Lab. Corp. of Am. Holdings*, 807 F.3d 14 (2d Cir. 2015), *certified question answered*, 27 N.Y.3d 817, 829 (2016) (holding that misrepresentations that are not communicated to a plaintiff cannot form the basis of a plaintiff's reasonable reliance). Accordingly, we hold that Loreley fails to establish by clear and convincing evidence that it relied on the defendants' representations.

Loreley also fails to establish by clear and convincing evidence that the defendants misrepresented or omitted material information for two of the three CDO deals at issue—the Octans II CDO and the Sagittarius CDO I. The defendants' representations that the collateral managers would exercise independence in selecting assets were not misrepresentations at all; Loreley has identified no evidence that the collateral managers ceded control of asset selection to a non-party hedge fund, Magnetar Capital LLC ("Magnetar"), which was also an investor in the CDOs. Moreover, the evidence indicates that Magnetar's involvement in asset selection was known to IKB. The defendants did not have a duty to disclose their knowledge of Magnetar's strategy because, based on what was already known to IKB and the high level of access IKB had to relevant information to conduct due diligence, this was information that could have been discovered through the exercise of due care.

For these reasons, we affirm the judgment of the district court.

5

## BACKGROUND

This appeal is the second time that this matter has come before this court. We assume some familiarity with the subject matter covered in our earlier opinion. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC* (*Loreley I*), 797 F.3d 160, 164-69 (2d Cir. 2015).

## I

This case concerns three CDOs—Octans II CDO ("Octans"), Sagittarius CDO I ("Sagittarius"), and Longshore CDO Funding 2007-3 ("Longshore")—that were sold to sophisticated investors, including Loreley, by Wachovia subsidiaries, the predecessors-in-interest to Wells Fargo Securities, LLC, Wells Fargo Bank, N.A., and SAI. The CDOs were managed portfolios of assets. The CDOs' assets were selected and managed by collateral managers Harding, an independent company, and SAI, a Wachovia subsidiary at the time. Harding was the collateral manager for Octans, and SAI was the collateral manager for Sagittarius and Longshore.

Loreley alleges that the defendants perpetrated two different fraudulent schemes. Loreley's allegations involve a non-party to this litigation: Magnetar, a hedge fund that invested in the equity tranches of the CDOs and simultaneously invested in the short-side of credit-default swaps ("CDS"), positioning itself against the senior tranches of those same CDOs. Loreley alleges that Magnetar coerced Harding and SAI into accepting poor-quality assets for Octans and Sagittarius. This coercion allegedly contradicted the defendants' representations in their offering materials that the collateral managers would exercise independence when selecting "high quality assets with stable returns" and would "minimize losses through rigorous upfront credit and structural analysis, as well as ongoing monitoring of asset quality

6

and performance." *Loreley I*, 797 F.3d at 167. Loreley invested $94 million into Octans in October 2006 and $10 million in Sagittarius Class A and B notes in March 2007. Octans and Sagittarius defaulted in May 2008 and October 2007, respectively.

Loreley's fraud allegations regarding the Longshore CDO do not involve Magnetar. As was the case with Octans and Sagittarius, the Longshore offering materials emphasized that the collateral manager, SAI, would exercise independence when selecting assets for Longshore and would acquire assets from Wachovia through arm's-length transactions. Contrary to these representations, Wachovia allegedly pressured SAI to accept assets for Longshore from Wachovia's warehouse at above-market prices so that Wachovia could avoid losses from another, canceled CDO deal.[1] In April 2007, Loreley bought notes of various Longshore tranches with a total face value of $59.1 million. These notes went into default by February 2008.

## II

In April 2012, Loreley filed suit in state court alleging state law claims for fraud, rescission, conspiracy, aiding and abetting, fraudulent conveyance, and unjust enrichment. *See* Am. Compl., *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 412 F. Supp. 3d 392 (S.D.N.Y. 2019) (No. 12-CV-3723), ECF No. 84. The suit was later

---

[1] A warehouse is a bank account that acquires collateral in anticipation of doing some type of securitization—in this case, creating collateralized debt obligations. If a securitization deal falls through, the bank continues to keep warehouse assets on its books and bears the market risk—gains and losses—on those assets.

removed to federal court pursuant to the Edge Act. *See* 12 U.S.C. § 632; 28 U.S.C. § 1441(a).

In March 2013, the district court (Sullivan, J.) dismissed the complaint with prejudice. Among other things, the district court held that Loreley had failed to meet the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b) for its fraud claims, and the district court also dismissed its related claims of aiding and abetting fraud, conspiracy to defraud, and rescission based on fraud. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12-CV-3723, 2013 WL 1294668, at *7-15 (S.D.N.Y. Mar. 28, 2013). Loreley appealed.

This court disagreed with the district court. As for the fraud claim relating to Octans and Sagittarius, we held that "[i]t is not for us to say at this stage whether Plaintiffs' account of Magnetar's role and of Defendants' sleights of hand regarding that role is true, nor is it for us to say whether, at a later stage, a judge or jury might find that such misrepresentations were immaterial to sophisticated investors like Plaintiffs." *Loreley I*, 797 F.3d at 174-75. With regard to the fraud claim relating to Longshore, this court held that Loreley had pleaded sufficient facts to survive the defendants' motion to dismiss but that "the complaint could be more detailed as to the timeline and valuation of the securities in question." *Id.* at 180. Our court also noted that because Loreley's losses on all three CDOs coincided with the financial crisis, there would need to be further inquiry at "later phases of this lawsuit" with respect to whether Loreley's claims would fail if "the CDOs would have collapsed regardless [of the alleged fraud], due to the larger crash in the MBS market." *Id.* at 188. Accordingly, we reversed in part, vacated in part, and remanded the case back to the district court.

## III

After remand, Loreley amended its complaint and removed the non-fraud claims, and the district court dismissed its conspiracy claim. Discovery was thereafter conducted between 2016 and 2018.

### A

Discovery revealed the following details about asset selection for Octans and Sagittarius.

Collateral manager Harding selected assets for Octans. Harding's founder, Wing Chau, testified that Harding would "source the CDO CDS exposure to the market," Harding's analysts would review those securities, and "to the extent that [the assets] met [Harding's] criteria and spread requirements, [Harding] would execute those transactions." App'x 579. Chau testified that "all the securities that went into the Octans" warehouse or CDO were "fully vetted by my analysts and myself." App'x 580. Harding analyzed each security to ensure that it met stringent eligibility criteria. Sometimes that analysis was formalized in a document sent to potential investors, including Loreley's investment advisor, IKB.

Collateral manager SAI selected assets for Sagittarius. SAI's James Burke testified that a team of analysts, organized with respect to each financial product, would consider each asset, model various scenarios, scrutinize the originator and the servicer of the assets, and generally "look at everything possible" before accepting the asset for placement in Sagittarius. App'x 508. He further testified that every asset that was accepted for Sagittarius was vetted by his team and that he accepted assets only with which he was comfortable from a credit perspective.

Magnetar, a hedge fund that purchased the equity tranches in a number of CDOs including Octans and Sagittarius, was also involved in suggesting assets for Octans and Sagittarius. As the equity tranche investor in these CDOs, Magnetar had considerable negotiating leverage with the banks. Magnetar's senior vice president, James Prusko, testified that Magnetar made "very clear that the CDO had to have certain structural features and certain economic terms that would make it attractive" for Magnetar to buy into the equity tranches. Confidential App'x 53. These structural features included suspending or eliminating certain cash-flow triggers—including tests such as the overcollateralization and interest coverage tests—that would have diverted cash flows from equity investors to more senior note holders if the value of a CDO's collateral fell below a certain level or if interest payments declined by a specified amount. This ensured that cash would continue to flow to Magnetar through its equity positions (positions that are usually subordinated to senior notes) even if returns to the more senior notes slowed or stopped altogether.

Simultaneously, Magnetar bought protection against defaults in the senior notes of both Octans and Sagittarius by taking short-side positions in credit default swaps on the same CDOs in which Magnetar held long equity positions. Prusko testified that Magnetar's goal on a portfolio-wide basis was to be "$2 of … shorts on [the senior notes] against every $1 of long equity exposure." App'x 3125. This strategy achieved a return of about $1 billion when the financial markets collapsed.

At Octans's inception, Prusko asked Wachovia and Harding to "discuss CDO exposure as I will source the CDO CDS." App'x 1970. Wachovia personnel considered Magnetar a "huge acc[oun]t," App'x

10

4132, believed that Magnetar was "single-handedly driving the market" for CDOs in 2007, App'x 3260, and characterized Magnetar as "the darling of Wall Street, the popular girl that everyone wanted to take to the prom," App'x 3145. Chau also testified that he knew Magnetar was hedging its position in Octans's equity tranche by buying protection on the senior tranches of Octans and on the senior tranches of other CDOs in which it owned equity. He noted that hedge funds, as part of their hedging strategy, generally purchase hedging instruments that correlate with the underlying assets. Chau testified that he "knew that [Magnetar] would hedge" in the same or a similar way. App'x 3051. However, Chau maintained in his testimony that "all the securities that went into the Octans II warehouse or CDO [were] fully vetted by my analysts and myself" and that those securities "met all the investment criteria." App'x 580. Chau repeatedly denied that any asset had been accepted for Octans that had not been vetted and approved by his team.

Unlike Chau, Burke testified that he "had no reason to suspect" that Magnetar was taking short positions against the CDOs in which Magnetar had long positions in the equity tranches; he affirmed that he was "shocked" when he learned of Magnetar's strategy because he had "[n]ever heard of anyone doing that." App'x 2994. Burke testified that he did not allow Prusko to source assets for Sagittarius. On at least one occasion, Burke informed Prusko that he "would not accept assignment of … trades," App'x 1632, and complained to Wachovia that "Prusko is under the impression that he can source credit risk … for this deal at whatever levels he wants. I specifically [do] not want this to occur," App'x 1635. Although Burke characterized Prusko as an "extremely important client," App'x 3580, he testified that Magnetar did not have the authority to select assets for Sagittarius.

11

Burke even rejected on principle assets that Magnetar suggested, but he later relented and accepted the assets because he felt "okay with the credit risk." App'x 511-12.

**B**

Discovery revealed the following details about asset selection for Longshore.

SAI was the collateral manager for Longshore. Beginning in February 2007, Wachovia noted "market volatility" and "feared contagion and/or disappearance of liquidity in [the] CDO market" and sought to unload its inventory and to accelerate pending deals. App'x 3439. Wachovia identified Longshore as one of the "[d]eals of focus" that Wachovia wanted to accelerate before liquidity "disappear[ed]." App'x 3439.

Wachovia sought to transfer assets into Longshore from the warehouse of a canceled CDO deal at the original prices rather than at the then-current market prices. When Burke learned that Wachovia would be transferring assets to Longshore from the canceled CDO's warehouse—the "Grand Avenue" warehouse, managed by a collateral manager named TCW—he informed Wachovia by email:

> I am VERY sensitive to where SAI might take down bonds from the TCW warehouse. I do not want anymone [*sic*] in the market to think we were stuffed with bonds at above-market prices. So – if TCW is still doing a deal, SAI should only take whatever bonds it wants at MARKET prices.

App'x 1972. Subsequently, Burke wrote to Dash Robinson, a director in Wachovia's Asset Repackaging Group, stating that "[t]he marks you provided for the bonds to be transferred over to [Longshore] …

12

are not defensible" and that "the difference between your marks and the trading system (on the cash bonds alone) is over $1 mm" and the "difference on the CDS will be much larger." App'x 4206.[2]

On March 13, 2007, Wachovia's chief compliance officer, David Hunt, defended the asset transfer at the above-market prices by explaining that SAI's "fiduciary responsibility extends to each of its clients" and requires SAI to obtain the "best execution" possible. App'x 3450. Burke responded by suggesting that the full list of assets and the prices at which those assets were transferred be disclosed to prospective investors before Longshore was priced and before prospective investors committed. He was concerned that investors would object if they committed to Longshore and subsequently learned that Longshore had accepted $300 million of collateral at above-market prices. That same day, Burke emailed his wife that "I'm having a very bad day. I'm being asked/told to do something that I believe is improper/unethical." App'x 4952.

Over Burke's objection, the Grand Avenue assets were transferred to Longshore at the original purchase prices rather than at the current market prices. Burke's team "review[ed] all the bonds in the warehouse" and told him "exactly which bonds they were comfortable with from a credit perspective." App'x 529. Burke testified that only those bonds that met the eligibility criteria from a risk perspective were taken into Longshore. SAI ultimately accepted all but two bonds for Longshore.

---

[2] "Marks" refers to the assets' "mark to market," which is the value of each asset at the market price at the time of each inventory. *Mark to market*, Wolters Kluwer Bouvier Law Dictionary (2012).

However, Burke "made it very clear that these were not assets that [he] had purchased into [Longshore's] warehouse, and if [he was] going to take those assets into [the] warehouse today, [he] would want them to happen at the current market price." App'x 3009. Burke believed the "marks" were inaccurate and "should have been marked lower." App'x 3020. He also testified that he "made it very clear" that all investors were to have information about the purchases and was told that they in fact received that information. App'x 3021.

Wachovia advised IKB of a slight decline in the value of the Longshore assets since those assets were acquired—specifically, that "the current weighted average price of the Longshore 3 portfolio is just under 99" and that there were mark-to-market losses for the deal on closing. App'x 1296, 1299. IKB subsequently requested the current marks of the Longshore portfolio. Wachovia sent a spreadsheet that did not contain the current market prices of the transferred assets and from which the current marks may have been deleted. However, emails between Wachovia's Robinson and IKB appear to indicate that a spreadsheet containing the current marks may have been sent to IKB on or around March 4, 2007.

## C

Offering materials for Octans, Sagittarius, and Longshore were distributed to potential investors, including IKB. For Octans, the materials included term sheets, a marketing book, and an offering circular. Octans's offering memorandum identified Harding as the collateral manager and explained that the "performance of the portfolio … depends heavily on the skills of the Collateral Manager in analyzing and selecting the Collateral Debt Securities." App'x 5020. It also specified that Octans is a "complex instrument[] … involv[ing]

14

a high degree of risk and [is] intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved." App'x 2178.

Wachovia also provided term sheets, a marketing book, and an offering memorandum for Sagittarius. The term sheet noted that SAI's relationship with Wachovia provided "[a] key market advantage for SAI" because SAI could "leverage off of the resources and infrastructure of Wachovia, while maintaining strict separation from the trading and sales side of the broker/dealer." App'x 2551. SAI's investment approach was described as "maximiz[ing] returns and minimiz[ing] losses through rigorous upfront credit and structural analysis as well as ongoing monitoring of asset quality and performance." App'x 2551. Just like the offering memorandum for Octans, the offering memorandum for Sagittarius stated that Sagittarius's performance would be "highly dependent" on SAI's financial and managerial expertise, App'x 2585, and that Sagittarius is a "complex instrument[] … intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved," App'x 395. The offering memorandum also cautioned that any investor in Sagittarius should have the knowledge and experience to evaluate the merits and risks of this investment and should exercise independent judgment in its decision to invest in Sagittarius.

Finally, Wachovia provided term sheets, a marketing book, and an offering memorandum for Longshore, all of which made similar representations as those in the offering materials for Octans and Sagittarius. Longshore's marketing book also promoted SAI's relationship with Wachovia, explaining that the relationship gave SAI "vast resources and infrastructure" while "maintaining strict

15

separation from the broker/dealer." App'x 2696. Just as in Octans's and Sagittarius's offering materials, the memorandum explained the importance of the collateral manager's skills in analyzing, selecting, and managing collateral and explained that Longshore's performance would be "highly dependent" on SAI's expertise. App'x 2796. The circular also warned potential investors that even though SAI was a subsidiary of Wachovia, SAI may nevertheless engage in securities transactions with Wachovia that might result in conflicts of interest. In those circumstances, the circular guaranteed that SAI would acquire collateral "on an arm's-length basis" and "at fair market prices" but could take advantage of other benefits of the relationship such as "obtaining favorable commissions." App'x 4013.

## D

Discovery also revealed IKB's prominent role in Loreley's decision to invest in the CDOs. IKB was a German banking company that created the Loreley entities and served as the investment advisor for those entities' investment into Octans, Sagittarius, and Longshore. These investments were part of a larger investment program called the Rhineland Program. IKB advised Loreley, but it did not invest directly on Loreley's behalf because it did "not have authority to act for or represent" Loreley or the authority to "incur any obligation or liability on behalf of" Loreley. App'x 1571.

IKB assessed potential investments for the Rhineland Program to ensure those investments met IKB's criteria. A potential investment would go through several levels of review. When approached with an investment opportunity, IKB would commence due diligence. This process included analyzing the CDO's risk, evaluating the investment in terms of its financial structure, and vetting the experience and

expertise of the collateral manager. IKB's chief investment officer and the investment committee would then "sign off" on the investment proposal before it was given to Loreley. App'x 743. SAI's James Burke testified that IKB "conducted the most thorough due diligences of any investor [he] had ever met with." App'x 507.

Consistent with its general practice, IKB conducted a risk analysis on Octans. IKB noted that because of "increasing pressure from equity investors," Octans did not have overcollateralization and interest coverage tests and "[i]n return the rating agencies demanded a thicker equity tranche and therefore a higher subordination for the rated notes." App'x 1097-98. However, IKB noted that Octans did have a net loss test, effective five years after the closing date, that triggered cash diversion from subordinate tranches if the loss in the portfolio "correspond[ed] to the amount of the nominal volume of the preferred shares." App'x 1097. The net loss test and relatively high subordination were "demanded by the rating agencies to balance out the weaker structure," which IKB saw as a "positive." App'x 1098.

IKB performed various stress tests on the Octans portfolio and concluded that the portfolio withstood the "IKB worst case scenario." App'x 1099. IKB also "emphasized positively" the "experience and long-time collaboration of the key persons of the [Harding] team." App'x 1098. IKB had more than one in-person meeting with representatives from Harding during which it performed "on-site due diligence" and vetted the collateral manager. App'x 1098.

IKB then created an investment proposal for IKB's Investment Advisory Board. In this proposal, IKB noted Wing Chau's experience and the experience of Harding's senior managers, who had spent over twelve years in structured finance and related fixed income sectors.

App'x 1014. IKB explained the various stress tests it had performed and concluded that in a worst-case scenario, the portfolio loss would be only about 3.68 percent. App'x 1024. IKB based its final recommendation on four factors: the "quality of the Manager," the results of the stress tests, the structural features of the portfolio, and other "credit enhancement[s]." App'x 1028. IKB ultimately recommended that Loreley invest in Octans and provided its investment proposal to IKB's Advisory Board. IKB's internal risk analysis was not included.

IKB also created an investment proposal recommending investment in Sagittarius. IKB favorably described SAI's "rather conservative investment approach," about which IKB had learned during its meetings with "James Burke and key staff of his team." App'x 1039, 1043. IKB performed various stress tests and other risk analysis and noted that "there are very rare issues which can be categorized as being totally clean from a risk perspective at this point in time." App'x 1042. IKB also observed that "uncertainty exists around the question" of whether the portfolio's conservative asset selection and structural enhancements would be "sufficient to completely immunize [the] bonds in a further deteriorating environment against defaults." App'x 1042. As with Octans, IKB identified the absence of overcollateralization and interest coverage tests but noted that the CDO's structural features showed "adequate protection for the Noteholders despite the innovative financing structure." App'x 1045. IKB explained that the "[e]quity investor [was] the driving force" behind the structure and therefore "any beneficial change to this was not negotiable," but "real shortfalls will be unlikely due to the structure of the transaction's liabilities." App'x 1046. IKB also observed that "systemic deterioration is expected" and

18

that the unproven depth of the synthetic market could limit SAI's ability to react proactively to unfavorable market events. App'x 1047. Finally, IKB commended SAI's "close relationship to Wachovia," noting the flexibility that the relationship provided SAI. App'x 1043. IKB characterized SAI as an "above average Manager," with a "prudent" management style, that was "uncomfortable with … above average risk characteristics in the pools they … consider for investments." App'x 1043.

Based on these considerations, IKB recommended investment in Sagittarius. In making its recommendation, IKB highlighted two major factors: the "high quality of the manager" and the structure of the transaction. App'x 1048. IKB conveyed the recommendation to Loreley through a letter that accompanied IKB's investment proposal.

IKB additionally created an investment proposal for Longshore. IKB recommended investment into Longshore based on the "good quality of the underlying portfolio" as well as SAI's good judgment, strict eligibility criteria, and tight overcollateralization test levels that would divert cash flows into senior tranches if the portfolio collateral deteriorated. App'x 1213. IKB based its evaluation on several in-person meetings between members of IKB and key members of SAI, including Burke. Just as IKB noted in the investment proposal for Sagittarius, IKB favorably described SAI's "close relationship to Wachovia" and the flexibility it gave SAI to react to market developments. App'x 1218. IKB also emphasized SAI's conservative approach to choosing collateral and characterized SAI as an "above average Manager." App'x 1218. IKB observed that SAI's conservative asset selection process was in part based on SAI's concern about reduced liquidity in the credit markets. IKB identified no weaknesses in the investment into Longshore. IKB's final

19

investment proposal did not include Burke's disclosure regarding the slight decline in the value of the Longshore assets from collateral taken from the canceled Grand Avenue CDO. IKB's investment proposal recommended investment into Longshore and was approved by IKB's Investment Committee before it was given to Loreley.

Loreley based its investment decisions solely on these investment proposals. Loreley did not receive any other materials—including any of the offering materials—prior to investing into Octans, Sagittarius, and Longshore. Loreley also did not independently confirm whether the investments conformed to IKB's investment criteria.

**IV**

On September 17, 2019, the district court (Crotty, J.) granted summary judgment to the defendants on several independent grounds. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC* (*Loreley II*), 412 F. Supp. 3d 392 (S.D.N.Y. 2019). The district court held that Loreley had failed to provide clear and convincing evidence that (1) Loreley had detrimentally relied on the defendants' representations, *id.* at 409, 411, or (2) the defendants had made any material misrepresentations or omissions concerning the collateral managers' independence or Magnetar's role in the Octans and Sagittarius deals, *id.* at 407-08.[3]

---

[3] Because we affirm the district court on these grounds, we need not decide other questions that the district court considered, such as whether Loreley established loss causation. *See Loreley II*, 412 F. Supp. 3d at 412.

The district court held that Loreley failed to establish the reliance element of fraud because the defendants' purported misstatements in the offering materials were "not ultimately transmitted to Plaintiffs in IKB's written investment proposals." *Id.* at 411. The district court also held that even if Loreley had relied on the defendants' representations pertaining to Octans and Sagittarius, those representations were true and not misleading. *Id.* at 410. The district court also concluded that there was no material omission regarding Magnetar's role in those deals because Magnetar's role was known to IKB, which decided not to make further inquiries about Magnetar's strategy. *Id.* at 409. Having dismissed Loreley's claims of fraud, the district court dismissed its related claims—conspiracy to defraud, aiding and abetting fraud, and rescission based on fraud. *Id.* at 412.

Loreley timely appealed.

### STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo* and will affirm if "the movant shows that there is no genuine dispute as to any material fact" and the "movant is entitled to judgment as a matter of law." *Lehman XS Trust, Series 2006-GP2 v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 123 (2d Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). We consider the record in the light most favorable to the non-movant, *Jackson v. Fed. Exp.*, 766 F.3d 189, 192 (2d Cir. 2014), and we resolve all ambiguities and draw all factual inferences in favor of the non-movant "if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

21

## DISCUSSION

On appeal, Loreley argues that the district court erred in granting summary judgment to the defendants on Loreley's fraud claim. We disagree and affirm the judgment of the district court. Loreley has failed to establish by clear and convincing evidence that it reasonably relied on the defendants' representations or, for the Octans and Sagittarius deals, that the defendants materially misrepresented or concealed the collateral managers' independence or Magnetar's role in asset selection and investment strategy.

## I

Under New York law, the five elements of fraud are "(1) a material misrepresentation or omission of fact (2) made by [a] defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006); *Pasternack*, 27 N.Y.3d at 827. Each element "must be shown by clear and convincing evidence." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995). At the summary judgment stage, a plaintiff must offer enough evidence to allow a reasonable jury to find by clear and convincing evidence that each of the elements is met. *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) (citing *Crigger*, 443 F.3d at 234, and *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119 (1969)); *see also Banque Franco-Hellenique de Commerce Int'l et Maritime, S.A. v. Christophides*, 106 F.3d 22, 25 n.2 (2d Cir. 1997). "Clear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to

22

opposing presumptions." *Seon v. N.Y. State Dep't of Motor Vehicles*, 74 N.Y.S.3d 20, 25 (N.Y. App. Div. 1st Dep't 2018) (alteration omitted) (quoting *In re Gail R.*, 891 N.Y.S.2d 411, 414 (N.Y. App. Div. 2d Dep't 2009)), *rev'd on other grounds*, 35 N.Y.3d 1032 (2020).

Loreley's claim for fraud fails because Loreley has not established reliance. Loreley has not identified any evidence, much less clear and convincing evidence, that it received any communications from the defendants. Misrepresentations that were not communicated to a plaintiff cannot form the basis of a plaintiff's reasonable reliance. *Pasternack*, 27 N.Y.3d at 829. It remains undisputed in this appeal that the defendants did not communicate directly with Loreley. *Compare Loreley II*, 412 F. Supp. 3d at 410, *with* Appellants' Br. 50-55. It is also undisputed that Loreley's investment decisions were based solely on IKB's advice and proprietary investment proposals. IKB did not give Loreley the offering materials that were created and distributed by the defendants or even IKB's internal risk analyses that IKB had conducted during its due diligence. Because Loreley cannot show that the defendants' purported misrepresentations actually reached Loreley, it cannot show that it relied on these purported misrepresentations.

To avoid this problem, Loreley argues that it reasonably relied on the defendants' indirect communications because IKB "summarized" the defendants' alleged misrepresentations for Loreley. Appellants' Br. 49. This theory of reliance is not viable under New York law. The reliance element of fraud cannot be based on indirect communications through a third party unless the third party acted as a mere conduit in passing on the misrepresentations to a plaintiff. *Pasternack*, 27 N.Y.3d at 828-29.

23

Here, the record does not create a disputed issue of material fact as to whether IKB acted as a mere conduit. Reliance on an intermediate third party can form the basis of a claim for fraud when the third party acts as a scrivener by transcribing and distributing a defendant's representations without filtering or modification. *Pasternack*, 27 N.Y.3d at 828 (citing *Eaton Cole & Burnham Co. v. Avery*, 83 N.Y. 31, 35 (1880), and *Bruff v. Mali*, 36 N.Y. 200, 206 (1867)). Such a theory of third-party reliance is limited. When the defendants' misrepresentations are "filtered through" a third party's "own process of evaluation" or the third party plays "a significant role in choosing what information it wanted to receive and, in addition, what it deemed worthy of communicating," the third party has not acted as a mere conduit and the theory is not viable. *Sec. Investor Prot. Corp. v. BDO Seidman*, 95 N.Y.2d 702, 710-11 (2001).

That is the case here. The defendants' representations were "filtered through" IKB's "own process of evaluation"; IKB played "a significant role in choosing what information it wanted to receive and, in addition, what it deemed worthy of communicating." *Id.* IKB did not simply transmit the defendants' representations regarding the expertise and independence of the collateral managers. Rather, IKB vetted the managers, often meeting with the collateral managers in person, and drew its own conclusions about the strengths and weaknesses of the managers' investment philosophies. For example, IKB examined SAI's conservative investment philosophy and concluded that its approach would aid Sagittarius's and Longshore's future performance. IKB was also aware of abnormal structural features built into Octans and Sagittarius at Magnetar's insistence and factored those features into its analysis. Ultimately, IKB concluded that the features would be balanced by other, protective structural

24

features such as the net loss test. Moreover, despite the concerning structural features, IKB's stress tests revealed that shortfalls would be "unlikely." App'x 1046; *see also* App'x 1098.

IKB's filtering and evaluation process was extensive. IKB's due diligence involved conducting its own risk analyses, performing stress tests, and exercising independent judgment in determining the benefits and risks of investment in the CDOs. IKB's vetting process involved a multi-level review of the investment opportunities. IKB independently analyzed the risk, conducted stress tests, and created detailed investment proposals spanning hundreds of pages. Each proposal received approval from the chief investment officer and the investment committee before being presented to Loreley. In order to conduct its due diligence, IKB requested further information, as evidenced by the email exchanges between IKB and the defendants. IKB also met in person with the collateral managers for the purpose of vetting the collateral managers and collecting other information about the investment opportunities.

IKB played "a significant role in choosing what information it wanted to receive and, in addition, what it deemed worthy of communicating." *BDO Seidman*, 95 N.Y.2d at 710. Loreley did not receive offering materials created by the defendants. Loreley did not receive IKB's risk reports beyond what was summarized in IKB's proposals. In one instance, although the defendants' offering materials stated that Longshore assets would be acquired at fair market value, that representation was not included in IKB's written investment proposal—the only document provided to Loreley in support of IKB's recommendation. When SAI later informed IKB of the slight decline in the value of the Longshore assets from collateral taken from the canceled CDO, IKB requested and received further

information from the defendants. IKB, however, decided not to relay this information to Loreley because the information did not affect IKB's recommendation.

In fact, contrary to Loreley's argument, the evidence here indicates that the defendants did not intend for their representations to be passed to Loreley without filtering and modification.[4] Rather, the defendants expected that IKB would conduct its own due diligence on the deals. The offering materials caution that investing in the CDOs is appropriate only for investors with the expertise to assess complex instruments and encouraged prospective investors to conduct due diligence and to exercise independent judgment. The offering materials provided to prospective investors, including IKB, included hundreds of pages detailing valuations of the structured notes, risk analyses on various aspects of each CDO's portfolio, and

[4] The district court relied on *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262, 2015 WL 6243526, at *63 (S.D.N.Y. Oct. 20, 2015), for the proposition that "for Plaintiffs to have reasonably relied on statements communicated through a third party, Defendants must have intended for the misrepresentations to be communicated by the third party, IKB, to Plaintiffs." *Loreley II*, 412 F. Supp. 3d at 411-12. Under New York law, however, reliance on communications from a third party cannot form the basis of a fraud claim, regardless of the defendant's intent, unless the third party was a mere conduit. *Pasternack*, 27 N.Y.3d at 828-29; *see also id.* at 834-35 (Fahey, J., dissenting) (disagreeing with the majority that reliance cannot be established through evidence that a third party relied on the alleged misrepresentation even when the misrepresentation was made with the intent of influencing the plaintiff and causing injury). Even if intent were relevant, the evidence in this record is neither clear nor convincing that the defendants intended for IKB to transmit its representations to Loreley without substantial filtering, evaluation, and modification; rather, the evidence indicates that the defendants knew IKB was conducting due diligence and that it would not act as a mere conduit.

26

complex contractual conditions triggered by various stress scenarios. *See, e.g.*, App'x 2194-97. These materials called for the application of expertise and analysis. Additionally, IKB was known to be a sophisticated investment advisor. As noted above, according to SAI's Burke, IKB "conducted the most thorough due diligences of any investor [he] had ever met." App'x 507.

For these reasons, Loreley has not established reliance by clear and convincing evidence.

**II**

Loreley also fails to show by clear and convincing evidence that defendants misrepresented that the collateral managers would

exercise independence [5] in selecting assets for Octans and Sagittarius.[6]

Loreley argues that the defendants ceded control of asset selection to Magnetar. Yet even if Magnetar exerted pressure over the asset selection process, the evidence does not show that either Harding or SAI allowed Magnetar to control the process. Both Chau and Burke testified that each security considered for Octans and Sagittarius was vetted by their teams and accepted only if the security

---

[5] The defendants correctly note that the offering materials did not expressly represent that the collateral managers would exercise independence. Appellees' Br. 39-41. The only express representation in the offering materials regarding independence is Wachovia's representation that SAI would acquire collateral "on an arm's-length basis" and "at fair market prices," App'x 4013, in transactions with Wachovia. This representation does not implicate the defendants' relationship to Magnetar. However, to the extent that the offering materials emphasized that the collateral managers' expertise would be important to the CDOs' performance, and those statements implied that the managers would exercise independent judgment in asset selection, the fact that a third party with possibly adverse economic interests was dictating asset selection would be inconsistent with that representation and material to an investor's decision to invest. *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999) (noting that a material fact is one "significant to a reasonable person considering whether to enter into the transaction").

[6] We cannot reach the same conclusion with respect to Longshore because Loreley has offered sufficient evidence—including that the then-current marks of the Longshore portfolio may have been withheld from IKB—for a factfinder to find by clear and convincing evidence that Wachovia and SAI misrepresented that assets for Longshore would be acquired in arm's-length transactions. As explained above, however, because those misrepresentations were never communicated to Loreley, Loreley's fraud claim pertaining to Longshore fails for lack of reliance.

met the CDOs' stringent eligibility criteria.[7] In fact, Burke and Prusko appear to have had a tense relationship because Burke insisted on maintaining his independence during this process. Burke would not allow Prusko to originate assets for Sagittarius. On one occasion, Burke informed Prusko that he "would not accept assignment of … trades," App'x 1632, and complained to Wachovia that "Prusko is under the impression that he can source credit risk … for this deal at whatever levels he wants. I specifically [do] not want this to occur," App'x 1635. Burke maintained that Magnetar did not have the authority to select bonds for Sagittarius, and he even rejected on principle several bonds suggested by Magnetar, later relenting because those bonds met Burke's risk criteria.

Moreover, Magnetar's role in structuring both deals was known to IKB. IKB's investment proposals for both Octans and Sagittarius observed that an "[e]quity investor [was] the driving force" for the deal, App'x 1046, and that several abnormal structural features had been added to Octans and Sagittarius "[o]n the basis of the increasing pressure from equity investors," App'x 1098. IKB accounted for Magnetar's demands in its analysis. IKB's investment proposals for both Octans and Sagittarius noted that these abnormal structural features created risks—even though IKB determined that the risks did not outweigh the benefits of investment.

---

[7] Chau could not remember the specific characteristics and selection process for each bond that was vetted and accepted for Octans by his team, but that alone does not establish "that it is highly probable" that Chau did not exercise independent judgment when selecting assets for Octans. *In re Gail R.*, 891 N.Y.S.2d at 414; *Seon*, 74 N.Y.S.3d at 25.

The defendants did not have a duty to disclose Magnetar's investment strategy beyond what was already known about Magnetar's involvement in the deals. To establish a material omission, Loreley must proffer clear and convincing evidence establishing that the defendants had a duty to disclose the material information. *See Banque Arabe*, 57 F.3d at 153. "[A] duty to disclose may arise in two situations: first, where the parties enjoy a fiduciary relationship, and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *see Mariano v. CVI Invs. Inc.*, 809 F. App'x 23, 27 (2d Cir. 2020). It is undisputed that Loreley cannot establish material concealment under the former theory because the parties were not in a fiduciary relationship.

Loreley also cannot establish material concealment under the latter theory because "the [undisclosed] information" was of the kind "that could have been discovered … through the 'exercise of ordinary intelligence.'" *Mariano*, 809 F. App'x at 27 (quoting *Jana L. v. W. 129th St. Realty Corp.*, 802 N.Y.S.2d 132, 135 (N.Y. App. Div. 1st Dep't 2005)). Magnetar's role was known to IKB.[8] Despite knowing that an equity investor was exerting "pressure" to include certain structural features that increased the risk of investing in the CDOs—and indication that the investor at least had mixed motives—IKB did not inquire further about the identity or strategies of that investor. It would not have been

---

[8] At oral argument, the defendants' counsel emphasized that "IKB had direct contact with Magnetar in other contexts, knew Magnetar was investing in CDOs in the equity tranches … but never inquired further." Oral Argument Audio Recording at 27:03-27:13; Transcript of Oral Argument at 20. Loreley did not dispute that characterization on rebuttal.

30

difficult for a sophisticated investment advisor such as IKB—which conducted thorough due diligence and which had extensive access to relevant information—to have made that inquiry. IKB's failure to ask Wachovia about other investors' identities or strategies precludes finding that the defendants had a duty of disclosure based on superior knowledge.[9]

Loreley has therefore failed to establish a material misrepresentation or omission with respect to Octans and Sagittarius.

## CONCLUSION

For the foregoing reasons, we conclude that Loreley has failed to offer clear and convincing evidence supporting its claim of fraud. Because we hold that Loreley has failed to establish a fraud claim, we also conclude that Loreley has failed to establish its related claims of conspiracy to defraud, aiding and abetting fraud, and rescission

---

[9] Additionally, the record does not indicate that SAI even possessed superior knowledge of Magnetar's strategies. Burke testified that he was not aware that Magnetar was taking short positions against the CDOs in which Magnetar had long positions in the equity tranches; he affirmed that he was "shocked" when he learned of Magnetar's strategy. App'x 2994. Chau appears to have been aware of Magnetar's strategy, but he had no reason to believe that IKB was acting "on the basis of mistaken knowledge." *Lerner*, 459 F.3d at 292. Chau did not consider Magnetar's strategy remarkable but testified that hedge funds generally purchase hedging instruments that correlate to the underlying assets. Because "[h]edge funds hedge," Chau testified that he "knew that [Magnetar] would hedge" and did not consider it remarkable that Magnetar had done so. App'x 3051.

based on fraud. Because summary judgment was appropriate on these claims, we **AFFIRM** the judgment of the district court.[10]

---

[10] We do not address whether the district court erred by excluding an untimely expert report submitted by Loreley. The report concerned loss causation and therefore does not change the disposition of this appeal.